## W. C. (BILL) JENKINS v. STATE.

No. A-10235. July 2, 1945.

(161 P. 2d 90; 162 P. 2d 336.)

330

Creekmore Wallace, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore,

Asst. Atty. Gen., and Roy P. Parham, Co. Atty., of Okemah, for defendant in error.

(Note by PRESIDING JUDGE: Judge DICK JONES having certified his disqualification, the Honorable LAWRENCE JONES of the Bristow, Creek County, Bar, was appointed by the Governor as special judge.)

LAWRENCE JONES, Special Judge. W. C. (Bill) Jenkins was convicted of the crime of manslaughter in the first degree and appeals. He does not deny that he shot and killed the deceased, one Roy Bradburn, but insists that such killing was in his necessary self-defense. Certain legal propositions, hereinafter discussed, are presented which make it necessary to consider the relationship existing between the defendant and the deceased prior to the fatal difficulty.

In June, 1930, the defendant, a negro, married Sukie Seavers, the daughter of one Nancy Seavers, a full-blood Creek Indian. Nancy Seavers lived on her allotment about two miles north and two miles east of the city of Weleetka, and the defendant following his marriage took up his residence with his wife, Sukie, in a small house on his mother-in-law's farm, which was located about 40 or 50 feet south of the principal dwelling house. In 1935, the deceased Bradburn married Nancy Seavers and thereafter lived with her in the larger of the two dwelling houses on said farm. As a result of this arrangement, the defendant and the deceased lived practically in the same yard together for a period of about six years preceding the fatal shooting which occurred at approximately 7:00 o'clock p.m., August 11, 1941, near a barn lot about 200 feet west and south of the two dwelling houses above mentioned.

The defendant testified that on the morning of August 11th he rode to Weleetka in a coupe automobile operated by the deceased. That the deceased appeared to be very angry and during the trip charged the defendant with having gone to Muskogee to employ a lawyer "to fight him and Herb House at Muskogee, something about his wife's money." That at the time he made this accusation the deceased held a pistol in his hand and "said if I had anything again him to get on him, we could get it over with." "I told him I was 21 years old and I could get on if I wanted to and he kept holding the gun and telling me to crawl on him." And "he told me I had caused him more trouble than anybody in the world and he was tired of it." "He said there was a bunch of long-tailed rats at Weleetka he was going to get even with and that I was one of them. He said I used to think you would do; but I found out you won't, and don't come back to the house or I will kill you; and don't tell anybody what I said to you . . . I mean don't tell anybody what I said to you." The defendant then testified that as soon as he and the deceased reached the city of Weleetka he got out of the car and went to Okemah for the purpose of. telling the county attorney about the threats being made by the deceased, but that the county attorney was away on vacation and he did not contact him. That he did not wait to see the assistant county attorney, who would have been available in a short time, nor did he go to the sheriff's office.

On cross-examination, the defendant was interrogated as to whether he and the deceased had been on good terms prior to the altercation above mentioned and in that connection testified:

"Q. You and he were good friends so far as you knew at that time in the morning, 6:30 o'clock, on August

11th, when you started to town with him? A. I couldn't say. Q. So far as you were concerned? A. Yes, sir. Q. You were not mad at him? A. No, and I didn't know he was mad at me."

Defendant also stated that he was 30 years of age and weighed 235 pounds, while the deceased was 60 years of age and weighed 160 pounds. That the deceased did not actually point the gun at the defendant but held it in his left hand while driving his car with the right hand.

The defendant next testified that after he left the county attorney's office he went to see his attorney, Mr. Clem Stephenson, of Okemah; that he arranged through his attorney to purchase an automobile which was to be delivered at the defendant's home about 5:00 o'clock p.m. of the same day, but that he did not tell his attorney about the trouble between himself and Roy Bradburn. That after he made arrangements to purchase the car he rode back to Weleetka with Mr. Lee Carter, a deputy sheriff, but said nothing about the trouble he had had with Roy Bradburn, his explanation being "I didn't think it would do any good." That he did tell Austin Webb and his wife, who were good friends of his, that Bradburn had threatened to kill him and that he also told one Taylor Lockhart about it.

The defendant next testified that after his return to Weleetka from Okemah he went to the place of business of one Max Scott where he had previously pawned a pistol; that he owned two pistols, one of which was pawned to one Carol White and the other to Scott. That he redeemed the pistol pawned to White and then exchanged that pistol with Max Scott for the one previously pledged to Scott, which was a 32-20 automatic. That he wanted an automatic because "I didn't want to carry a gun that

people could see." That thereafter he returned to his home arriving there about 5 o'clock in the evening. That he looked for his wife and found her at the home of her mother, Nancy, and at his request she accompanied him to his own home. That he went with her to the upstairs room of the house and told her what had happened between himself and Roy Bradburn that morning. That he remained in the house about one hour and 40 minutes when he heard Bradburn calling hogs. That he went to the upstairs window of his home and observed the deceased as "he went down to the tank where he fed the hogs at." That he then went and sat on the bed with his wife for some five or six minutes, after which time "I got up and went to the window and seen him walk away from the scene where he was feeding the hogs and started back to the house." As to what transpired from then until the shooting, the defendant testified:

"A. I had my pistol laying up on the side-board where we keep the clothes and one of the kid's shirts laying over it and I reached under the shirt and got my gun and stuck it right here (indicating) and went on downstairs and went in the east gate at the lot and went on out on the south side, and when I got to that gate I pushed the safety off the gun and went on down the trail and Roy Bradburn was coming facing me. We were meeting each other face to face and I didn't want Roy to see this gun, because he knowed I didn't tote a gun and if he saw it he would have knowed I wanted trouble; and when I got pretty close, about to those first people standing up there, I kind of hunkered down in the road with my hand over the gun and picked up a little chunk and went to pecking on the ground in the middle of the road. Roy came up and when he got about as close as this gentleman stepped aside to the right and I said, 'Roy, why did you abuse me this morning.' And he looked at me and I said, 'Did you mean what you said this morn-

ing?' And he said, 'Yes.' I said, 'You think I am going to leave my wife and babies?' He said, 'You come down for trouble and you can get it.' He had a sack in his left hand and throwed this sack down and made two steps backwards and went for his right side, and I went to firing and didn't quit, pulling the trigger as fast as I could. Q. How many shots did you fire? A. Six. Q. Then what did you do? A. I turned around and went back to the house. My wife was upstairs and I told her to come down and take me to town. I wanted to give up, that I had killed Roy."

Immediately following the shooting, the defendant went to Weleetka, surrendered to the officers and was taken to the county jail at Okemah, where he first made an oral statement and later a written statement in question and answer form which he signed and verified. The written statement was admitted in evidence during the trial at the request of both the state and the defendant.

As previously stated, the defendant returned him from Weleetka at about 5 o'clock in the evening and had a conversation with his wife concerning the difficulty between himself and Bradburn. In that connection, the defendant's statement is as follows:

"Q. What did you tell her was liable to happen? A. I was liable to kill him or he would kill me, she said, 'You haven't got nothing to kill him with.' I said, 'That's what you think.' I had laid by gun under a shirt on the dresser, and I pushed the shirt back and said, 'There it is.' Well, I stood there with my head down and thought a long time. She said, 'Rather than for you and Roy to have trouble, I'll kill him when he's asleep.' Q. Sukie said that? A. Yes, I said 'No, you are a woman and me a man.' I said 'I'll do it, I don't care what kind of punishment they put on me.' When Roy come in she went to crying and I went out the door and she said 'Where you going?' I said 'Going down here.' She said, 'Roy's liable

to kill you.' I said, 'I don't care if he do.' So I went on down there to the pasture. Q. Where was that? A. Down in the pasture. Q. Did you watch Roy go feed his hogs? A. He went down to the tank, I was standing upstairs, you can see all over the place, so I waited till he started back, didn't want to walk up behind him, when he started back I stepped downstairs and went on, meeting him, when he got pretty close, well I sat down, had the gun sticking in my belt with the safety off, sat down just like that (hunkered down) when Roy got about as far as here to that man. Q. About eight feet? A. Yes, I said why did you abuse me this morning, and he pitched another fit. I told him, I said, 'Well, I guess you think I'm going to get up and walk off and leave my wife and babies?' Q. You still sat there? A. Yes, he stepped back and run his hand in his pocket and said, 'We'll get this over right now, I told you not to come back.' When he stepped back and put his hand in his pocket I just up and shot as I was getting up. Q. How many times? A. Six, the first time shot him right here (left temple) next time right here, I thought (under right eye.)— Q. You told Sukie before you went down there you was going to kill him? A. Or him kill me one. Q. You was going down there and have it out? Yes. . . . Q. Did you discuss this trouble with L. L. Puckett? A. No, sir. Q. Discuss it with Lee Carter? A. No, sir. Q. You knew Lee was an officer, you knew where Mr. Kennedy's place of business was here, you, Clem was your lawyer, did you discuss it with him? A. Didn't discuss it with anybody but my wife. Q. Just your wife? A. That's all. Q. When did you make up your mind to kill him? A. I had it in my mind, but didn't exactly make up my mind till my wife said what she did about killing him in his sleep, I said 'no, I'm a man.' Q. That's when you told her you would do it regardless of the punishment they gave you? A. We was going to have it out, either him or me. Q. What about that statement you made just awhile ago about the punishment you might get, you just told us, what were your words? A. I meant he might get me, he's better on the trigger than I am. Q. In other words, what you

said, or what you had in mind was to go down there if necessary and shoot it out with him, and the best man win? A. Yes. Q. You told Sukie you were going down there to kill him? A. I said him or me."

The evidence shows conclusively that the deceased was not armed.

For reversal, it is urged, first, that the court erred in excluding proof of certain threats made by the deceased against the defendant.

The defendant offered to testify that in the year 1936 Roy Bradburn went to Okemah and attempted to have the defendant prosecuted under the miscegenation statute and undertook to have his children brought before the juvenile judge of Okfuskee county in a proceeding to decree the defendant's children dependent and neglected for the purpose of having them placed in an orphan's home for negro children. The court, over the objection of the defendant, excluded this offer of proof.

The defendant next offered to prove by his own testimony and by the testimony of one Lester Ganns that in the spring of the year 1936 Ganns, while working for the deceased, told the defendant that the deceased had hired him, Ganns, to kill the defendant and had promised to give him an interest in a ranch if he would do so; that Ganns told the defendant that he wasn't going to kill him because he had known him for a long time and that he was going to take the gun which Bradburn had given him back to Bradburn and that he did return the gun and told Bradburn that he was not going to carry out his agreement to kill the defendant. This offer of proof was likewise excluded.

The defendant also offered to testify that in the year 1939 he had a conversation with one Otto Strangfield in

the course of which he told the defendant that Roy Bradburn had approached him, the said Strangfield, and offered to pay him in money and political favor if he would kill the defendant; that Strangfield refused to have anything to do with such proposition. This offer of proof was likewise objected to and the objection sustained. However, Otto Strangfield was later called as a witness by the defendant and denied that he had ever had a conversation of any kind with Bradburn concerning the defendant, Jenkins.

The defendant next attempted to testify that in the spring of 1941 he rode to Oklahoma City with one Frank Mason, and that during this trip, Mason told him Roy Bradburn had tried to hire him, Mason, to kill the defendant and that he refused to do it and that Mason told him to be careful when he was around Bradburn, that he wanted to kill him. The court sustained an objection to this offer of proof but later permitted Frank Mason to testify to the foregoing facts. In addition, the defendant and numerous witnesses were permitted to testify that the deceased was a dangerous, overbearing, turbulent person; that he carried a pistol on his person and in his car and that in the year 1934 he shot and killed two men and wounded another.

Inasmuch as Otto Strangfield denied that he ever had a conversation with the deceased concerning the defendant and Frank Mason was permitted to testify, the only offers of proof wholly excluded were with reference to conversations between the deceased and Lester Ganns in the year 1936, and the effort of deceased to have the defendant prosecuted under the miscegenation statute, which was also in the year 1936.

On a trial for murder, where the plea is self-defense

and where there is some evidence other than threats tending to support the plea, proof of threats, communicated or uncommunicated, is admissible; the latter as a circumstance to be considered in connection with all the other evidence in the case in determining the state of the deceased's feeling toward the defendant and who was the probable aggressor in the fatal difficulty and for no other purpose; the former, not only for that purpose, but also as a circumstance in determining what the defendant might reasonably have apprehended from the overt act and demonstration of the deceased, if he made any, at the time of the fatal difficulty. Saunders v. State, 4 Okla. Cr. 264, 265, 111 P. 965, Ann. Cas. 1912B, 766; Foster v. State, 8 Okla. Cr. 139, 126 P. 835; Rogers v. State, 8 Okla. Cr. 226, 127 P. 365.

In Rhea v. Territory, 3 Okla. Cr. 230, 105 P. 314; Saunders v. State, 4 Okla. Cr. 264, 266, 111 P. 965, Ann. Cas. 1912B, 766, it was held that the defendant was not justified in killing the deceased because he had made threats against him. It must appear that the deceased was attempting to carry such threats into execution. In this case, the defendant, under his own testimony, was the aggressor and intended to either kill or be killed. One who seeks and brings on an affray cannot shield himself under a plea of self-defense. Young v. State, 11 Okla. Cr. 22, 141 P. 285.

The law of self-defense is solely and emphatically a law of necessity; it does not imply the right of attack and could not avail the defendant if he was the aggressor, or if the fatal difficulty was sought for by him, or was provoked by him by any wilful act of his own reasonably calculated to bring it about, or if he voluntarily or of his own free will entered into it, no matter how hard he was

pressed or how great his danger became during the progress of the difficulty. Rollen v. State, 7 Okla. Cr. 673, 125 P. 1087; Moutry v. State, 9 Okla. Cr. 623, 132 P. 915.

It has also been held that where a defendant seeks or provokes a difficulty without any intention of killing or doing serious bodily injury to the deceased and a conflict results and the defendant, being hard pressed, kills the deceased, then he will be guilty of manslaughter. Koozer v. State, 7 Okla. Cr. 336, 123 P. 554.

Proof of threats is admissible only after evidence tending to show some overt act on the part of the deceased at the time of the killing sufficient to furnish a predicate for a plea of self-defense.

Assuming the defendant's testimony that at the time of the shooting the deceased took a couple of steps backward and made a motion with his hand to his right side accompanied by the statement, "You come down here for trouble and you can get it," would constitute such a predicate, and the trial court should have admitted the excluded evidence, it does not follow that the error was a material or reversible one. The defendant's own testimony shows conclusively that he deliberately armed himself and went out to meet his adversary for the purpose of killing or being killed. Thus entering into a mutual combat, he deprived himself of the right to plead self-defense. Johnson v. State, 69 Okla. Cr. 51, 111 P. 2d 265; Green v. State, 54 Okla. Cr. 450, 23 P. 2d 506; Riley v. State, 40 Okla. Cr. 323, 268 P. 996; Crowell v. State, 42 Okla. Cr. 392, 276 P. 518. Also, as previously observed, the defendant was permitted to show that the deceased was a dangerous, quarrelsome, turbulent person, that he carried a pistol, that in the year 1934 he shot and killed two men and wounded another and that he had

made threats against the defendant. Therefore, the rejected evidence was largely cumulative.

On the question of mutual combat, the facts in this case have heretofore been stated. We are at a loss to understand how under these facts the position can be taken that it does not come clearly within the law as to mutual combat under the many decisions of this court. The law is so clearly stated by Presiding Judge Furman in the early case of Koozer v. State, 7 Okla. Cr. 336, 123 P. 554, that we quote the syllabus:

"Where a defendant without real or apparent necessity voluntarily enters into a mutual combat with another, in which he takes the life of his antagonist, such killing will not be in self-defense, but the defendant will be guilty of either murder or manslaughter, according to the circumstances and nature of such combat.

"'Where a defendant has sought or provoked a difficulty with the deceased, in order that he might have an opportunity or pretext for killing or inflicting serious bodily injury upon him, and in such combat does kill the deceased, the defendant is guilty of murder, it matters not how hard pressed he may have been in the conflict, unless after such provocation had been given, and before the fatal blow was struck or shot was fired, it appears from the evidence that the defendant abandoned such intention and in good faith sought to withdraw from the conflict. If this appears from the evidence, then the defendant's right of self-defense would revive, and he would have the same right to defend himself as though he had not furnished such provocation.

"Where a defendant seeks or provokes a difficulty without any intention of killing or doing serious bodily injury to the deceased, and a conflict ensues, and the defendant, being hard pressed, kills the deceased, then appellant will be guilty of manslaughter, unless before the fatal blow was struck or shot was fired the defendant

sought to withdraw from the combat as explained in syllabus 5 (above).

"No man can take advantage of his own wrong and plead as a defense for taking human life a necessity which arose from his own intentional wrongdoing. The line of demarcation between murder and manslaughter is the character of the intention with which the defendant seeks, occasions, or provokes a fatal difficulty, and this intention is to be gathered from the facts and circumstances in evidence."

This case has been followed by many decisions of this court where the facts were very similar to those in the case at bar, and in many instances the facts here are much stronger than the case cited.

In the case of Evans v. State, 8 Okla. Cr. 78, 126 P. 586, Judge Doyle, in rendering the opinion of the court, says:

"Where the killing was done in mutual combat, entered into willingly, and in the knowledge of its liability to cause death to one or the other of the combatants, the defendant cannot justify on the ground that it was committed in self-defense, and it will be manslaughter at least, unless the defendant can prove that before the mortal stroke was given he had refused any further combat and retreated as far as he could with safety, and that he killed his adversary of necessity to save his own life or his person from great bodily harm."

And, in the body of the opinion, says:

"The threats testified to, and the altercation in the forenoon followed by fencing out the horses of the deceased, which no witness denies, and the defendant arming himself with a deadly weapon, and going to where the deceased was tearing down the fence, at least could be but a challenge to mutual mortal combat. And where the killing is done in mutual combat, entered into willingly, and in the knowledge of its liability to cause death

to one or the other of the combatants, the slayer cannot justify on the ground that it was committed in self-defense.

"Says Mr. Wharton:

" 'If the defendant in any way challenged the fight, and went to it armed, he cannot afterward maintain that in taking his assailant's life he acted in self-defense. "A man has not," as is properly said by Breese, C. J., "the right to provoke a quarrel and take advantage of it, and then justify the homicide." Self-defense may be resorted to in order to repel force,. but not to inflict vengeance. "Non ad sumendam vindictam, sed ad propulsandam injuriam." There is certainly no law to justify the proposition ·that a man may be the assailant and bring on an attack and then claim exemption from the consequence of killing his adversary on the ground of self-defense. While a man may act safely on appearances, and is not bound to wait until a blow is received, yet he cannot be the aggressor and then shield himself on the assumption that he was defending himself. "And an adulterer caught in the act by the husband is guilty at least of manslaughter, if, in repelling a murderous attack by the husband, he kill the husband. But where the defendant, without an intent to take the deceased's life, provoke the quarrel, this, while it destroys the excuse of self-defense, does not, if the deceased's attack put the defendant's life in danger, militate against reducing the offense to manslaughter." ' . . .

"Where the killing is done in mutual combat, it will be manslaughter at least, unless the survivor can prove that before the mortal stroke was given he had refused any further combat and had retreated as far as he could with safety, and that he killed his adversary from necessity, to save his own life, or his person from great bodily harm.

"If the defendant acts from fear of death or great bodily harm, he must be free from fault in bringing on the difficulty. The defendant in this case by his own

unlawful acts brought on the difficulty, and, if there was a hostile demonstration on the part of the deceased, it was the duty of the defendant to employ all reasonable means within his power, consistent with his own safety, to avoid the danger and avert the necessity of taking the life of his assailant. This is the law, and it is so stated in the instructions given. If we consider the matter in the most favorable aspect for the defendant, he is upon his own testimony guilty at least of manslaughter in the first degree."

See, also Johns v. State, 8 Okla. Cr. 585, 129 P. 451; and Wadsworth v. State, 9 Okla. Cr. 84, 130 P. 808.

It will be noted that in the instant case, defendant armed himself and went to the place where he knew deceased would pass, after telling his wife: "I was liable to kill him, or he would kill me." And testifying, said:

"Q. When did you make up your mind to kill him? A. I had it in my mind, but didn't exactly make up my mind till my wife said what she did about killing him, I said no, I am a man."

In the case of Larry v. State, 10 Okla. Cr. 340, 136 P. 596, 597, Judge Doyle, speaking for the court, says:

"In the view we take of this case, we do not think it necessary to discuss the questions raised by the defendant. The testimony of the state shows a case of deliberate assassination. While the defendant's own testimony shows a case of killing in mutual combat, willingly entered into by the defendant, if we consider the case in its most favorable aspect for the defendant, he is upon his own testimony guilty at least of manslaughter in the first degree.

"Where the killing is done in mutual combat, entered into willingly, and in the knowledge of its liability to cause death to one or the other of the combatants, the slayer cannot justify on the ground that it was committed in self-defense, and it will be manslaughter at

least, unless the survivor can prove that before the fatal shot was fired he had refused any further combat and had retreated as far as he could with safety, and that he killed his adversary of necessity to save his own life or his person from great bodily harm. Evans v. State, 8 Okla. Cr. 78, 126 P. 586."

In Moutry v. State, 9 Okla. Cr. 623, 132 P. 915, it is said:

"Where a defendant seeks or provokes a difficulty with deceased in order that he may have a pretext for killing or inflicting serious bodily injury upon him, and in such conflict does kill the deceased, the defendant is guilty of murder, it matters not how hard pressed he may have been in the conflict, unless after such provocation has been given or difficulty sought or provoked and before the fatal blow is struck or shot is fired the defendant in good faith abandons such intention, and seeks to withdraw from the conflict."

And in the body of the opinion:

"The only question presented in the brief of counsel for appellant is that the court erred in its instructions as to the law of self-defense. We think that the court did err in giving this instruction, because self-defense was not a possible legitimate deduction to be drawn from the evidence offered. Under these conditions, the court should not have instructed upon this issue at all, and any errors which the instructions may contain could not have possibly injured appellant. The error, if any, was in favor of, and not against, appellant. We think that the evidence offered makes out a case of murder, and that the jury in finding appellant guilty of manslaughter in the first degree were probably misled by the too favorable instruction toward appellant which was given by the court."

See, also, Dodd v. State, 25 Okla. Cr. 263, 219 P. 952; Driggers v. State, 1 Okla. Cr. 167, 95 P. 612, 129 Am. St. Rep. 823; Weatherholt v. State, 9 Okla. Cr. 161,

131 P. 185; Phelps v. State, 64 Okla. Cr. 240, 78 P. 2d 1068.

The facts in this case are well illustrated by the words of Presiding Judge Furman in the case of Lumpkin v. State, 5 Okla. Cr. 488, 115 P. 478, 482, when he said:

"Strike from the record every word of evidence on behalf of the state except that of Dr. Weber, which is not denied, and it must be taken as an admitted fact that the deceased was powerless to harm the appellant and was in a defenseless condition when he received the last shot. In connection with this, take the admission of the appellant that he fired all the shots that were fired during the difficulty, and the proof amounts to demonstration of the fact that the appellant shot the deceased while he was lying in a helpless condition on the floor, when the glamor of death was in his eyes, and the rattle of death was in his throat, just as John Fitzpatrick testified that appellant did do. Connect this with the testimony of Jesse Boright, a witness for the appellant, to the effect that the appellant had stated to him that he had killed the deceased with his own pistol, and there is absolutely no rational escape from the conclusion as to the guilt of the appellant. Even if appellant was mistaken in saying that he had killed the deceased with his own pistol, it is clear that appellant knew when he fired this shot he killed an unarmed and defenseless man."

The contention that the question of murder should not have been submitted to the jury under the evidence in this case is clearly untenable. Under the law and the evidence, a judgment and sentence for murder would have been upheld. The fact that the deceased was a bad man and had previously killed other parties cannot be considered by this court, and by the jury only in consideration of the question of who was the probable ag-

gressor. It was evidently by reason of this fact that the jury returned a verdict of manslaughter and assessed his punishment at a term of only 15 years in the penitentiary. Judge Furman in the case of Thompson v. State, 6 Okla. Cr. 50, 117 P. 216, 226, stated well this proposition when he said:

"We think that the fact that both Gillstrap and appellant were not sentenced to be hanged on account of their part in the brutal and cowardly assassination of the deceased is the highest possible tribute that could be paid to the zeal and ability of their counsel. That the deceased may have been a bad man cannot for one moment be considered. In the eyes of the law this would not afford the least justification or mitigation for the crime committed. No man has the right to take the law in his own hands and constitute himself sheriff, judge, jury, and executioner, and of his own motion arrest, try, convict, and execute another man, simply upon the ground that the man so executed was a bad man. If this was the law, no one would be safe. Every man who amounts to anything has enemies, and it could always be proven by them that he was a bad man. Even if the deceased was a bad man, it is certain that appellant and those acting with him did not give him a dog's chance for his life. Deceased was unarmed and in a defenseless condition at the time that he received the fatal wound. It was proven that at this time his pistol was at the house and in the possession of Mrs. Clark, who tried to be a swift witness for appellant, and it was also proven that the appellant knew this. Appellant and those acting with him laid in wait for an unarmed man, and finally killed him, without giving him any warning, or giving him the least chance for his life. We are only surprised that the jury did not inflict the extreme penalty of the law in this case."

Many of the facts in the Thompson case are similar to the facts in the instant case.

Justifiable homicide is defined by the Oklahoma Statutes, Tit. 21, O. S. 1941 § 733, as follows:

"1. When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person is; or,

"2. When committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress, or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished; or,

"3. When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed; or in lawfully suppressing any riot; or in lawfully keeping . . . the peace."

The mere statement of this statute is sufficient to show that under the facts of the case at bar and under the testimony of the defendant himself, he does not come within its terms. Defendant and deceased both resided upon the property where the killing occurred. Defendant testified that there had been no ill feeling between them prior to the morning of the tragedy. He testified that deceased on that morning threatened to kill him and told him not to come back to the premises, and that was his reason for taking his gun and going in search of the deceased at the time of the fatal difficulty, claiming that his action was in defense of his home and family.

The question of the defense of his home is not presented in this case. Mere threats do not justify action unless there is an attempt on the part of the party making the threats to carry them into execution. It has been held in many cases in this state that one may resist trespass upon his property, not amounting to a felony, by any use of reasonable force, but he must suffer a tres-

pass and loss of his property where a felony is not attempted, rather than to commit a homicide. Jones v. State, 59 Okla. Cr. 53, 56 P. 2d 423; Hare v. State, 58 Okla. Cr. 420, 54 P. 2d 670; Dyer v. State, 58 Okla. Cr. 345, 53 P. 2d 700; Schmitt v. State, 57 Okla. Cr. 102, 47 P. 2d 199.

In the case of Armstrong v. State, 11 Okla. Cr. 159, 143 P. 870, and the case of Collegenia v. State, 9 Okla. Cr. 425, 132 P. 375, there was an attempt to enter the home of the defendant and the defendant repelled this invasion of his home. In the instant case, the deceased lived upon the same premises with the defendant, but in a different house. He had a perfect right to be there. There was no attempt to carry out any threat he may have previously made against the defendant. He in no wise attempted to enter or molest the home of the defendant. On the other hand, all the advancement was made by the defendant himself, and at a time when the deceased was unarmed, and in no position to do bodily harm to the defendant. The evidence revealed that deceased's gun was in the pocket of his automobile at a great distance from where the difficulty occurred, and he was in his shirt sleeves, so that it could have been easily observed by the defendant that he was unarmed. We are at a loss to understand how it can be maintained that the deceased was the aggressor from the start.

This court has frequently stated, as set forth in Thacker v. State, 55 Okla. Cr. 161, 26 P. 2d 770, 774:

"Before this court can reverse a conviction upon the ground that the trial court erred in the admission or rejection of evidence, . . . it must further find, from an examination of the entire record, that the appellant was injured thereby; and to determine this issue the

court must consider the question as to whether the appellant is guilty or innocent of the offense charged."

Under the defendant's own testimony, his guilt of the crime of manslaughter is clearly and conclusively established and there is no good reason to believe that upon a second trial a jury could or would arrive at any other verdict than of guilt.

It is next urged that this case should be reversed because the defendant was denied a constitutional right by reason of the fact the record does not affirmatively disclose that he was served with a list of witnesses expected to be called in chief to prove the allegations of the information, together with their post office addresses, at least two days before said case was called for trial, as provided by article II, sec. 20, of the Constitution of this state.

To sustain this contention reference is made to the cases of Sutton v. State, 35 Okla. Cr. 263, 250 P. 930, 934; Goben v. State, 20 Okla. Cr. 220, 226, 201 P. 812; Ex parte Barnett, 67 Okla. Cr. 300, 94 P. 2d 18; decided by this court; and the case of Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461, 146 A.L.R. 357, and other cases referred to in the dissenting opinion filed in this case.

Before referring to these cases we note that the record discloses that the crime with which defendant was charged was committed on August 11, 1941. At his preliminary hearing he had eminent counsel of his own choice. The information in the district court was filed September 9, 1941, and his trial, at which he was represented by attorneys of his own selection, was had on September 24, 1941. The record also discloses that he was arraigned in the presence of his lawyers on Septem-

ber 10, 1941, and given until September 11, 1941, to plead, and on that date he "waived the reading of the information, and enters plea of not guilty." Also, the record discloses that on September 24, 1941:

"State appearing by county attorney Roy Parham and Assistant County Attorney, Dane Seran; Defendant present in person and by counsel Stephenson and Walter Billingsley. Both sides announce ready for trial, and the clerk of the court ordered to draw a jury."

The record does not disclose that defendant or his counsel ever at any time suggested that the list of witnesses to be used by the state had not been served. When the case was ended and the verdict was rendered, a motion for new trial was filed, but nowhere in this motion was it stated that the names of the witnesses to be used by the state had not been served upon the defendant. The first time this question is raised is on the appeal in this case.

In Baker v. State, 65 Okla. Cr. 136, 83 P. 2d 586, 587, and numerous other cases, this court has held:

"Error must affirmatively appear from the record; it is never presumed. Every presumption favors the regularity of the proceedings had upon the trial. The plaintiff in error must affirmatively show prejudicial error; otherwise the judgment of the trial court will be affirmed."

In the case of Sutton v. State, supra, the facts were very different to the facts here presented. In that case the crime was committed on December 30, 1925. The defendant was arrested on January 4, 1926. He was immediately taken before the county attorney and signed a written confession. A complaint was filed on the same date, and he immediately waived preliminary examination, and was held to the district court. About one hour

thereafter, he was taken from the county attorney's office to the district court room. He was served with a copy of the information, and a list of the state witnesses, with their post office addresses. He was arraigned and court recessed until one o'clock in the afternoon of the same day, at which time he entered a plea of guilty and was by the court sentenced to be electrocuted. He had no counsel appointed to represent him, and the record discloses that he was ignorant of court procedure, and did not understand the effect of his plea of guilty. He immediately made a motion to vacate and set aside the judgment, and to withdraw his plea of guilty, and he be permitted to enter a plea of not guilty. This motion was denied, and an appeal was had to this court, and the judgment reversed. A statement of the facts is all that is necessary to show the difference in the cases. The case was reversed because the defendant did not have counsel appointed by the court, and was not apprised of his rights by the court, and the shortness of the time between his arrest, his arraignment, and his plea of guilty. The court states:

"Held, that under this provision of the Constitution the defendant in a capital case does not have to demand a list of the witnesses to be called in chief, because the Constitution makes the demand for him, and the trial court is without authority to force him to trial until this provision has been complied with, *unless the defendant has waived this right.*"

It will be noted that the court used this expression: "Unless the defendant has waived this right." Reference will hereafter be made to cases directly referring to the "waiver" by a defendant of this provision.

In the Goben case, supra, the facts were almost identical with the Sutton case. The defendants were ar-

rested on March 31, 1921, in Texas, and brought to Oklahoma county jail, and on the 8th day of April taken to the town of Fletcher, in Comanche county, for a preliminary examination. An information was filed in Comanche county on April 12, 1921, and the defendants were taken to Lawton and arraigned. The court at this time appointed an attorney to represent the defendants, and William Tait, a codefendant, on the same day entered a plea of guilty, and the court fixed April 14, 1921, as the date of sentence, and on that date a sentence of death by electrocution was entered. On April 12, 1921, defendant filed a demurrer, which was overruled, and exception allowed. He then entered a plea of not guilty, and the case was called for trial. The defendant filed a motion for continuance, which was overruled. He was convicted and sentenced to death by electrocution. This case was reversed because the defendant was forced to trial without being given sufficient time to prepare for trial. It is unnecessary to go into detail. The facts justified this decision. The court, in the second paragraph of the syllabus, announced the same rule of law as referred to in the Sutton case.

In the Barnett case, and the Johnston v. Zerbst case, supra, the facts are in nowise identical to the facts in the instant case.

This court has on numerous occasions had under consideration the construction of the constitutional provision above referred to. The early cases are: State v. Frisbie, 8 Okla. Cr. 406, 127 P. 1091; Blair v. State, 4 Okla. Cr. 359, 111 P. 1003; Starr v. State. 5 Okla. Cr. 440, 115 P. .356; Spess v. State, 13 Okla. Cr. 277, 164 P. 131; Polk v. State, 26 Okla. Cr. 283, 224 P. 194; Galbert v. State, 12 Okla. Cr. 571; 160 P. 332; Franklin v.

State, 9 Okla. Cr. 178, 131 P. 183; Walker v. State, 10 Okla. Cr. 533, 139 P. 711; and Ross v. State, 34 Okla. Cr. 363, 246 P. 645.

And the later cases are Smith v. State, 69 Okla. Cr. 17, 99 P. 2d 527; Denton v. State, 58 Okla. Cr. 275, 55 P. 2d 1136; Coatney v. State, 52 Okla. Cr. 70, 2 P. 2d 604; Van Brunt v. State, 62 Okla. Cr. 188, 70 P. 2d 1103; Ferguson v. State, 53 Okla. Cr. 317, 11 P. 2d 211; McKee v. State, 38 Okla. Cr. 132, 259 P. 607; Strong v. State, 46 Okla. Cr. 167, 287 P. 1091; In re Opinion of Judges (In re Tuggle), 70 Okla. Cr. 83, 104 P. 2d 726; Tuggle v. State, 73 Okla. Cr. 208, 119 P. 2d 857; Ex parte Gilbert, 71 Okla. Cr. 268, 111 P. 2d 205; Ex parte Meadows, 70 Okla. Cr. 304, 106 P. 2d 139; Ex parte Wooldridge, 72 Okla. Cr. 292, 115 P. 2d 284; Ex parte Bradley, 72 Okla. Cr. 107, 113 P. 2d 611; Hudson v. State, 78 Okla. Cr. 160, 145 P. 2d 774; Ex parte Gault, 78 Okla. Cr. 172, 146 P. 2d 133.

In the Frisbie case, supra, Presiding Judge Furman, speaking for the court, said:

"A defendant in a criminal case may waive any right not inalienable, given him by the statute or by the Constitution, where it can be relinquished without affecting the rights of others and without detriment to the community at large.

"A defendant in a criminal case may waive any right not inalienable, given him by the statute or by the Constitution, either by express agreement or by conduct, or by such failure to insist upon it in seasonable time as will operate as an estoppel to his afterwards setting it up against the state.

"A narrow, technical rule of construction should never be applied to any provision of the Constitution, but it should be construed in its reason and spirit.

"Any person prosecuted in Oklahoma for a capital offense has the constitutional right to have furnished to him, at least two days before the trial begins, a list of the witnesses to be produced against him in chief by the state, and it would be error to force him into trial and allow such witnesses to testify against him whose names have not been so furnished, if he seasonably asserts his rights. But if he fails to object to going to trial on this ground, but announces ready for trial, he cannot afterwards avail himself of this objection, and the constitutional right given him by this provision will be waived."

And in the body of the opinion:

"The principles announced in these cases (Blair v. State, 4 Okla. Cr. 359, 111 P. 1003, and Starr v. State, 5 Okla. Cr. 440, 115 P. 356) meet our entire approval, and they are here reaffirmed. It is a well-settled principle of law, recognized by all appellate courts, that every one may waive a right intended for his own benefit if it can be relinquished without affecting the legal rights of others and without detriment to the community at large. See Reid v. Field, 83 Va. 26, 1 S.E. 395. The right of waiver extends to and includes all descriptions of contractional, statutory, and constitutional rights, except such as are inalienable. An examination of the following cases will show that they fully support the preceding statement: State v. Mitchell, 119 N.C. 784, 25 S.E. 783, 1020; Butler v. State, 97 Ind. 378; Williams v. State, 61 Wis. 281, 21 N.W. 56; Allen v. State, 16 Tex. App. 237; State v. Olds, 106 Iowa 110, 76 N.W. 644; State v. Sackett, 39 Minn. 69, 38 N.W. 773; State v. Polson, 29 Iowa 133; People v. Murray, 52 Mich. 288, 17 N.W. 843; Commonwealth v. Dailey et al., 12 Cush., Mass., 80; State v. Fooks, 65 Iowa 196, 452, 21 N.W. 561, 773; Connelly v. State, 60 Ala. 89, 31 Am. Rep. 34. . . .

"That the provision of the Constitution requiring that in capital cases a defendant shall have the right to have at least two days' notice of the list of witnesses to be used in chief against him, together with their post

.office addresses, confers a valuable right upon a defendant in a capital case cannot be denied. It gives him an additional opportunity to make inquiry as to the character, bias, and antecedents of the witnesses against him, and to learn something of their testimony and thereby better enable him to prepare for trial. He is not required by law to announce ready for trial in a capital case, and it would be error to force him into trial if he makes seasonable objection unless he has had this notice and this opportunity to make these investigations, and even after the two days have expired, if he can show that as the result of such notice, and as a result of such investigations, he has made discoveries as to matters not previously known to him, which will require him to make additional preparations for trial, upon such a showing under oath the court, in its discretion, may grant him a further postponement or continuance in order that such preparation may be made. It is the duty of the courts to protect a defendant in a capital case in the full enjoyment of this right. This is the substance and essence of the right conferred by the constitutional provision under discussion. This court has heretofore clearly laid down the rules by which it will be governed in construing constitutional provisions involving the rights of a defendant in a criminal case. . . .

"The public policy of this state as evinced by the Constitution of the state, the legislative enactments, and the repeated decisions of this court is to the effect that the spirit and reason of the law should control rather than that the cold, technical letter of the law should be enforced. We cannot bring ourselves to believe that a provision of our Constitution which was intended solely for the purpose of assisting a defendant to prepare for trial in order that justice might be done should be so construed as to make it a means for the defeat of justice and a refuge for criminals and a protection for crime. A little reflection will show that the construction placed upon this provision of the Constitution by the trial judge would have directly the opposite effect from that intended.

A defendant and his attorneys must of necessity know, when they announce ready for trial, as to whether or not a copy of the list of witnesses with their post office addresses, intended to be used by the state in chief, has been furnished to the defendant or his counsel. If they were permitted, when no such list had been furnished them, not only to remain silent on this question, but announce ready for trial, and permit a jury to be empaneled and sworn and jeopardy to attach, and then object to the reception of any testimony because they had not been served with a copy of the list of such witnesses, it would enable them to take advantage of their own wrong, and it would work the rankest kind of injustice to the state. When a defendant voluntarily announces ready for trial, this operates as a waiver of all preliminary steps prescribed for preparation for trial."

In this case (State v. Frisbie) the Blair and Starr opinions, by Judge Richardson and Judge Doyle, respectively, are quoted from with approval. Of the Blair case, it is said:

"After the state and the defendant had each announced ready for trial, and after the jury had been empaneled and sworn for the trial of the case, the defendant objected to proceeding any further and to the introduction of any evidence by the state on the ground that no copy of the information had been served upon him. This objection the court overruled, and the ruling is assigned as error. There was no error. Under the Constitution, the defendant is entitled to a copy of the accusation; but if he be at large so that he can go to the clerk's office, call for, and examine the original accusation and copy it for himself, if he desires, the state is under no obligation to make and serve a copy thereof upon him. Stack v. State, infra, 4 Okla. Cr. 1, 109 P. 126. In such case, the defendant may 'have a copy thereof' whenever he wants it. But, if the defendant be in custody and demands a copy of the accusation, the state must furnish it; but unless the defendant demands it before announcing

ready for trial, which he did not do in this case, his right to a copy is waived. (Citing a number of cases.) If the defendant be in custody, has not a copy of the information, and desires one, his demand therefor should be made in open court before announcing ready for trial; and the fact of the demand and the court's ruling thereon should be made a matter of record, or shown by proper recitals in the case-made."

And in the Starr case, it is said [5 Okla. Cr. 440, 115 P. 368]:

"Where a constitutional right in a criminal cause is largely for the benefit of the accused or in the nature of a personal privilege, the law is well settled that an accused may waive such right. In the case of State v. Adams, 20 Kan. 311, Mr. Justice Brewer said: 'So far as the provision in the Bill of Rights is concerned, there are two questions: (1) Is it anything more than the grant of certain privileges, which an accused may waive? And, where the record shows an application for the benefit of such privileges, and no refusal of the court to grant them, and no objection to any action of the court thereon, is there any error? (2) Does the sending of a jury to view the place of the alleged crime, in the absence of the defendant, trespass on any of its guaranties? First. The language is permissive. "The accused shall be allowed", that is, he may have if he wishes. If he does not wish he may forego. If he does not wish, then he cannot complain that they were not forced upon him. Generally that which is mere personal privilege, which is not essential to jurisdiction, which is not absolutely and peremptorily required by statute or public policy, may be waived. In the case of State v. Polson, 29 Iowa 133, the defendant consented that a copy of the testimony given in a former trial might be read as evidence instead of an oral examination of witnesses, and he was held concluded by such consent. His right to meet the witnesses face to face he had waived. So, while he is entitled to have counsel, he is not compelled to have them. He has a right to a subpoena for his witnesses, but he is

not obliged to have one issued. And the record need not show that these privileges or rights were formally tendered to him and formally declined, or that an express waiver was signed. It is enough if it does not appear that they were denied when he applied for them.'"

In the case of Walker v. State, 10 Okla. Cr. 533, 139 P. 711, 713, Judge Doyle, speaking for the court, said:

"Where a constitutional right is largely for the benefit of the accused, or in the nature of a personal privilege, the law is well settled that an accused may waive such right," citing with approval the cases of Blair v. State, and Starr v. State, supra.

Further along in the opinion, it is said:

"In the case of Logan v. United States, 144 U. S. 263-304, 12 S. Ct. 617, 630, 36 L. Ed. 429, it is said:

" 'The defendant, if indicted for treason, is to have delivered to him three days before the trial "a copy of the indictment, and a list of the jury, and of the witnesses to be produced on the trial for proving the indictment;" and if indicted for any other capital offense, is to have "such copy of the indictment and list of the jurors and witnesses" two days before the trial. The list of witnesses required to be delivered to the defendant is not a list of the witnesses on whose testimony the indictment has been found, or whose names are indorsed on the indictment; but it is a list of the "witnesses to be produced on the trial for proving the indictment." The provision is not directory only, but mandatory to the government; and its purpose is to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense. Being enacted for his benefit, he may doubtless waive it, if he pleases; but he has a right to insist upon it, and if he seasonably does so, the trial cannot lawfully proceed until the requirement has been complied with.'"

In Ross v. State, 34 Okla. Cr. 363, 246 P. 645, 646, the exact question here presented was considered and decided adversely to defendant's contention. This court said:

"It is contended next that a new trial should be granted because the defendant was deprived of his right to be furnished with a list of the witnesses to be used by the state, in chief, with their post office addresses. Upon this point the record is silent. The presumption is therefore that the defendant was either served with such list of witnesses, or went to trial without objecting to not having been served with the list, and so waived this right. In either event he cannot now be heard to complain. Error must affirmatively appear from the record. Every presumption favors the regularity of the proceedings had upon the trial, and the accused must affirmatively show prejudicial error. Killough v. State, 6 Okla. Cr. 311, 118 P. 620; Wallace v. State [29 Okla. Cr. 197], 233 P. 241."

The contention of the defendant that he did not at any time announce ready for trial is refuted by the record, which recites: "Both sides announce ready for trial, and the clerk of the court is ordered to call the jury."

It is true that defendant made a motion for continuance, but this application was based solely upon the absence of a witness, to which reference will hereafter be made. At no time did the defendant or his counsel demand a list of the witnesses, together with their post office addresses. The defendant had theretofore had a preliminary examination. He had been represented by counsel of his own choosing. He had been arraigned in open court and given time to plead. Under the authority above cited, the defendant is not permitted to sit silent, and after his conviction raise this question for the first time on appeal.

Under assignment of error No. 8 it is contended the court erred in refusing defendant's request for time in which to examine the court's instructions and settle and take exceptions thereto before the same were read. to the jury. On the question of the right to examine the instructions it is provided by 22 O.S. 1941 § 831, as follows:

"5. When the evidence is concluded, the attorneys for the prosecution may submit to the court written instructions. If the questions of law involved in the instructions are to be argued, the court shall direct the jury to withdraw during the argument, and after the argument, must settle the instructions, and may give or refuse any instructions asked, or may modify the same as he deems the law to be. Instructions refused shall be marked in writing by the judge, if modified, modification shall be shown in the instruction. When the instructions are thus settled, the jury, if sent out, shall be recalled and the court shall thereupon read the instructions to the jury."

The construction of this statute, where the identical question was raised as is here being considered, was before this court in the early case of Thompson v. State, 6 Okla. Cr. 50, 117 P. 216, 221. Presiding Judge Furman, in delivering the opinion of the court, expressed the rule which has been followed since that time:

"The only serious question in this case grows out of the following statement which we find in the record:

" 'Now, on this, the 28th day of October, 1910, the evidence in the case of the State of Oklahoma v. Robert Thompson was concluded, and whereupon the court immediately commenced reading his charge to the jury, and thereupon the attorneys for the defendant asked permission of the court to be allowed to examine and inspect the charge for the purpose of objecting and excepting to such part thereof as they might deem objectionable, whereupon

the court informed the attorneys for the defendant that they could take a general exception to the charge as a whole, and did not submit said charge to the attorneys for the defendant.'

"Section 20 of article 2, of our Constitution provided, that in all criminal prosecutions the accused 'shall have the right to be heard by himself and counsel.' This clearly means that in criminal prosecutions in Oklahoma the defendant has the right to be heard upon all matters and questions which are material to his defense, and that it is error for a court to refuse to allow counsel for a defendant in a criminal case to be heard upon the law of the case, as well as upon the facts of the case. In the case of Boutcher v. State, 4 Okla. Cr. [585], 586, 112 P. 762, this court said:

"Counsel for the defense have the right to be heard in the trial court upon the law, as well as upon the facts. This is fair to all parties concerned, and is necessary to the proper administration of justice. It gives the judge an opportunity to correct any errors which he may have made, and it gives the county attorney an opportunity, if he thinks the charge of the court is erroneous, to join with the defendant in requesting that such error be corrected. If counsel desire to make objections to the instructions which the court propose to give to the jury, and requests permission to do so, it would be error on the part of the trial court to refuse to give counsel such opportunity.'

"But, even if it were not for the constitutional provision above quoted, paragraph 5 of section 6823 of Snyder's Comp. Laws of Okla. 1909, (Tit. 2, O. S. 1941 § 831) clearly contemplates that counsel for a defendant, whenever they so desire, should be given by the trial court an opportunity to be heard upon the questions of law involved in the instructions of the court to the jury. Said section is as follows: (Statute quoted as above.)

"We believe that the administration of justice would be greatly promoted by the recognition on the part of

the trial court of the constitutional and statutory right of a defendant to be heard upon questions of law, as well as upon questions of fact, and that thereby the reversal of many cases would be avoided, and much time and expense would be saved to the state. Experience teaches that even the wisest and best men are sometimes mistaken in their views. It matters not how able and learned a judge may be, he cannot always, without the assistance of counsel prepare instructions which will fully and correctly present all the issues involved in a case to a jury. Independently of the constitutional and statutory provisions above quoted, prudence and justice would suggest that it would be safest and best, before submitting instructions to a jury to call upon counsel for both sides to point out specifically what objections, if any, they may have to such instructions, and to request them to suggest such additional instructions as they may think are necessary. It is true that this will take a little time in the trial of each case, but we are of the opinion that it would save a great deal more time by preventing mistakes and the reversal of convictions, which would thereby be avoided. But, even if this is not true, the question of time should not be considered where the administration of justice is at issue. We must all concede that no man knows everything, and that even the most humble and ignorant man we may meet on the street knows more about some things than we do. It is within the experience of all judges that valuable suggestions often come from the most unexpected sources. When a man is on trial for his liberty or life, there should be no undue haste. The proceedings should be conducted with deliberation, and every opportunity should be afforded both parties for furnishing information as to the matters involved, either as to facts or law. We therefore earnestly recommend that the trial court of this state in criminal cases, before instructing the jury, afford counsel for the defense a reasonable opportunity to be heard upon the law, as we are of the opinion that the refusal to do this when requested is error; and we also suggest that whenever the right to be heard upon the law is refused counsel for a

defendant, that this should appear by proper recitals in the records as was done in this case. It does not, however, necessarily follow that a failure to comply with such a request should in every case result in the reversal of a conviction. Two things must concur before this court will set aside the judgment of a lower court: First, there must be error in the proceedings of the lower court; second, it must appear from the record that the defendant has suffered some injury from such error. This is our settled policy. See Byers v. Territory, 1 Okla. Cr. [677], 698, 100 P. 261, 103 P. 532. The effect of the refusal to allow counsel for the defendant to be heard upon the law of the case, when they request this right, will be to cause this court to carefully scrutinize the instructions given, and if we find that the trial court has omitted to correctly and fully instruct the jury as to every principle of law applicable to the case, or that any of the instructions given by the court to the jury are erroneous and may have misled the jury in arriving at a verdict, to the injury of appellant, then the judgment of the lower court will be set aside and a new trial granted. In other words, where the trial court refuses to permit counsel for the defendant to be heard upon the law of the case, the instructions given will by this court be carefully examined for errors, both of omission and commission, and if any such errors are found, they will be ground for a reversal of the judgment, whether excepted to or not, if in the light of the entire record it appears that such errors may have operated to the injury of the appellant; we will therefore treat such paragraph of the instructions given as though exceptions had been properly saved to it. Save in one instance, we regard the instructions given as an admirable exposition of the law applicable to the facts of this case."

This rule has been followed in the cases of Fowler v. State, 8 Okla. Cr. 130, 126 P. 831; Russell v. State, 17 Okla. Cr. 164, 194 P. 242; Inman v. State, 22 Okla. Cr. 161, 210 P. 742. Two of these were homicide cases, and

one a rape case. The judgments and sentences were each affirmed.

With this statement of the law in mind, we examine the record in this case with reference to the request to examine the instructions. It reveals:

"Mr. Billingsley: Now comes the defendant and moves the court to recess long enough for his counsel to see the instructions and to determine whether or not he desires to offer additional instructions. The Court: Overruled; and let the record show that I have told counsel for the defense heretofore to present any instructions they wanted me to give and I would look them over and that up to this time, when both sides have rested, none have been presented to me. Mr. Billingsley: I want the record to show that immediately upon the state's closing that the court started to read the instructions and that immediately we asked for permission, and that just three minutes before the state closed that counsel for the defendant asked permission of the court to see the instructions to see whether or not he desired to offer additional instructions and that we had had no opportunity to see the instructions before they are read or to determine whether or not we think additional instructions should be given. The Court: All right, gentlemen: (Thereupon the court reads the instructions to the jury.) Mr. Billingsley: Comes now the defendant and requests the court to instruct the jury that if they find the defendant guilty of either murder or manslaughter in the first degree they shall fix his punishment in accordance with these instructions. The Court: All right, I am glad to do that. Mr. Billingsley: Comes now the defendant and requests time to prepare and submit a requested instruction on self-defense and at this time excepts to the instructions Nos. 8, 12, and 17. The Court: All right. Mr. Billingsley: We ask the court for an exception on those and move for time to prepare an instruction on self-defense. The Court: The last request is refused. The first one is granted. Mr. Billingsley: Exception. The Court:

Gentlemen of the jury, the law, as I understand it, is just as I have given you in these instructions in regard to fixing the punishment, unless there is a request by the defendant otherwise. It has been requested by the defendant otherwise, which I am glad to give you. I am glad to comply with it. In these instructions I have told you that if you find the defendant guilty of manslaughter and cannot agree upon the punishment that you can return your verdict into open court so stating and that then it will be the duty of the court to fix the punishment. But a request has been made that I don't do that, and that the jury fix the punishment in any event. I am glad to do that. You will fix the punishment if you find the defendant guilty. The Court: Gentlemen, can you agree on your time to argue this case? Mr. Billingsley: I think so. The Court: Gentlemen of the jury, I am told that you have asked for a recess. I will give you ten minutes. Go with the bailiff and stay together and don't talk about this case or allow anybody to talk to you about it. Be back here in ten minutes. (Thereupon a short recess is had and thereafter the following proceedings are had, to wit:) The Court: Gentlemen of the jury, since you have been out the defendant has offered an instruction; the first he has offered is good and the second he has offered I have already given you. I will read you that instruction which you will consider along with the other instructions: 'No. 7½. Gentlemen of the jury, you are further instructed that every person has a right to fight in his own necessary self-defense and to meet force with force and use whatever force is apparently necessary to repell an assault or threatened assault against him and in this connection you are instructed that the defendant is not required to retreat or run away but has a right to stand his ground and repel any assault or threatened assault against him by whatever means is apparently to him necessary, even to the extent of taking human life.' The Court: Now, this other I have already given you, but I am going to give it again: 'You are further instructed that in your deliberations to determine who was the aggressor in the fatal difficulty

that resulted in the death of the deceased you should, as nearly as possible, place yourself in the condition of the defendant and view the facts and circumstances surrounding the homicide from his standpoint and if, after a fair consideration of all the evidence in the case you believe or have a reasonable doubt thereof that the defendant acted in his own necessary self-defense then it would be your duty to acquit him and so say by your verdict.' The Court: Now I will just sign this and insert it in the instructions. Mr. Billingsley: That is agreeable with us."

From this record it will be noted that the court took a recess and counsel for defendant prepared instruction No. 7½, and another instruction, which are quoted above. They were given to the jury at the request of the defendant. Instruction No. 7½, in a very favorable manner to the defendant, presented the issue of self-defense. At the time this requested instruction was given to the jury, the court reread an instruction as above quoted, which dealt with the question of probable aggressor, and which was very favorable to the defendant. An examination of the instructions reveals that they covered every issue involved in this case, including the right of self-defense, and in terms that were very favorable to the defendant.

In view of the foregoing record, we are of the opinion that this case should not be reversed by reason of the proceedings of the trial court with reference to the examination of the instructions, as above set forth.

The defendant also insists that the court committed error in giving grammatical paragraph 2 of instruction No. 8, which is as follows:

"When the killing is proved beyond a reasonable doubt, or admitted by the defendant, and the plea of self-defense is interposed, as in this case, it then devolves

upon the defendant to show any circumstances to excuse or justify it by some proof strong enough to create in your minds a reasonable doubt as to whether the defendant acted in his real or apparent necessary self-defense, unless the proof on the part of the state shows that the defendant was justified in committing the act." ·

—and urges that by the foregoing instruction the court imposed the burden upon the defendant of establishing his innocence beyond a reasonable doubt. With this contention we cannot agree. The foregoing instruction was first approved in Culpepper v. State, 4 Okla. Cr. 103, 104, 111 P. 679, 31 L.R.A., N.S., 1166, 140 Am. St. Rep. 668. In Proctor v. State, 22 Okla. Cr. 445, 211 P. 1057, 1059, it was held:

"Where the killing is admitted, as in this case, the claim of self-defense is an affirmative defense, requiring testimony to support it. This, in a sense, is a shifting of the burden of evidence, but is not inconsistent with the presumption of innocence as applied to all criminal cases." Jones v. State, 20 Okla. Cr. 233, 202 P. 187, 189; Culpepper v. State, 4 Okla. Cr. 103, 104, 111 P. 679, 31 L.R.A., N.S., 1166, 140 Am. St. Rep. 668." ·

In Morris v. State, 35 Okla. Cr. 5, 247 P. 418, the instruction here complained of was given in substance and approved.

When this case was called for trial on the 22nd day of September, 1941, an affidavit for continuance was filed by the defendant, because of the absence of one witness, Vess Fugquay, whom it was alleged was a resident of Oklahoma City, Okla., and that if present, he would testify that about 20 minutes prior to the killing of deceased, he talked with him on the road from Weleetka to his home and that he had a short barreled 38 caliber pistol in his right-hand front pocket. That he would also tes-

tify with reference to the mashing down of certain weeds near the scene of the difficulty by himself and deceased and a 400-pound hog; and that about 60 days prior to the killing he saw deceased, Roy Bradburn, pull a gun upon a group of persons at his home, and that defendant was in this group, and that the deceased threatened to kill the parties at that time, and that he persuaded the deceased to quiet down. He further alleged that he had sent persons to Oklahoma City to try and locate the witness. He prayed for a continuance of the case for the term.

The record does not disclose that this motion for a continuance was ever passed upon by the court. The following minute is noted in the record as of September 22, 1941:

"State announced ready for trial and defendant announces they are not ready for the reason they are unable to locate material witness.

"Court passes said cause until Sept. 23, 1941, at nine o'clock a.m."

It is then revealed by the record that the case was not called for trial until the 24th day of September, 1941. At this time the record reveals that "both sides announce ready for trial, and the clerk of the court ordered to draw a jury."

It will thus be noted that this case was not called for trial until two days after the motion for continuance was filed. There is nothing in the record to show that the motion for continuance was overruled. When the case was called for trial on the 24th of September, the defendant did not present the motion for continuance, but announced ready for trial. There is nothing in the

record to show diligence on the part of the defendant with reference to the securing of this witness. It would have taken only a few hours after the filing of this affidavit on September 22nd to have had some one come to Oklahoma City and secure this witness. It is provided by Oklahoma Statutes 1941, Tit. 22, § 715, as follows:

"No person is obliged to attend as a witness, before a court or magistrate out of the county where the witness resides or is served with the subpoena, unless the judge of the court in which the offense is triable, upon an affidavit of the county attorney, or of the defendant or his counsel, stating that he believes that the evidence of the witness is material and his attendance at the examination or trial necessary shall indorse on the subpoena an order for the attendance of the witness."

The subpoena issued in this case is not attached to the motion for continuance, and no affidavit was filed by the defendant or his counsel, and no order was procured from the judge of the court in which the offense was being tried, directing or ordering the attendance of the witness. This was imperative, and it was a part of the duty of the defendant or his counsel to see that this was done. Hudson v. State, 20 Okla. Cr. 435, 203 P. 482.

In view of the above statement, certainly the court did not err in proceeding with the trial of the case on September 24, 1941. How any one can take the position that the action of the trial court was in violation of the due process clause of the Constitution of the United States or of the Bill of Rights is beyond our comprehension; or how it could be maintained that the defendant was deprived of having the right to obtain compulsory process for obtaining witnesses in his behalf.

It has so many times been held by this court that the overruling of a motion for a continuance is within

the sound discretion of the trial court, and unless this discretion has been abused, a case will not be reversed for this reason that the citation of authority is unnecessary. Certainly this court did not abuse its discretion in this case.

Lastly, it is argued that the county attorney, by asking leading. improper, incompetent and prejudicial questions of certain of the state witness, deliberately sought to prejudice the minds of the jurors against the defendant and that such conduct on the part of the county attorney was prejudicial to the rights of the defendant. We find no merit in this contention, particularly in view of the fact that during the trial no objection was made to the questions of the county attorney complained of.

Finding no prejudicial error, the judgment of the trial court is affirmed.

BAREFOOT, P. J., concurs. DOYLE, J., dissents.

DOYLE, Judge (dissenting). In my judgment the majority opinion affirming the judgment of conviction contravenes certain fundamental principles and consti-. tutional guaranties of personal liberty as set forth in the "Bill of Rights" of both the Constitution of the United States and the Constitution of the State of Oklahoma, in the procedure through which it was obtained, as hereinafter stated in my opinion, and also contravenes what has been the well settled law of this jurisdiction.

The law of the land guarantees to every person charged with crime, regardless of race or color, a fair and impartial trial, according to the due and orderly course of the law, and no duty rests more imperatively upon the courts than the enforcement of the constitutional guar-

anties of personal liberty and all provisions of the constitutions designed to safeguard the liberty and security of the citizen should be liberally construed by the courts.

As I interpret the law, the judgment of conviction in this case, as shown by the record, and its affirmance, was and is a denial of due process of law.

To a correct understanding of the errors assigned and the issues presented by the record, and to fully comprehend the rulings of the court, it will be necessary to set out at length a statement of the undisputed facts disclosed by the testimony and the rulings of the court in refusing to admit competent and material evidence offered on behalf of the defendant, which rulings were duly excepted to, also the contention that the verdict and judgment of conviction is unsupported by the evidence and is contrary both to the law and to the evidence.

The record shows the following chronology:

September 9, 1941, information filed in the district court.

September 10, the defendant arraigned and "given until Sept. 11. 1941, to plead."

Sept. 11, the defendant waived reading of information and enters plea of not guilty.

Sept. 22, State announced ready for trial, the defendant announced not ready, and filed application for continuance, the court passes said cause until Sept. 23.

Sept. 24, case called for trial, the jury impaneled and sworn to try the case.

Sept. 25, jury returned their verdict.

Sept. 29, motion for new trial was filed.

Oct. 4, 1941, motion overruled and judgment rendered in accordance with the verdict.

March 20, 1942, appeal by case-made with petition in error attached filed in this court.

June 30, 1942, application of plaintiff in error for order directing approval of bond and release from custody.

August 24, 1942, order entered directing approval of appeal bond by C. O. Beaver, District Judge.

October 19, application to disqualify Dick Jones, member of the court.

November 10, 1942, Judge Dick Jones certified his disqualification to participate in any of the proceedings in the case.

November 20, 1942, Hon. Leon C. Phillips, Governor, appointed Hon. Morton S. Rutherford, and who duly qualified as Special Judge in this case.

May 5, 1943, demurrer to application for disqualification of Hon. Morton S. Rutherford, as Special Judge, filed.

May 25, 1943, Hon. Morton S. Rutherford having certified his disqualification as Special Judge, Hon. Robert S. Kerr, Governor, appointed Hon. Lawrence Jones of Bristow, who having duly qualified as Special Judge, did so participate in the hearing of this case.

August 19, 1943, cause submitted on record, oral arguments and briefs and assigned to Jones, Special Judge, for opinion.

March 17, 1944, letter addressed to writer, by Special Judge Lawrence Jones, concludes:

"I feel that on account of the unusual delay in disposing of this case, the opinion should be handed down as quickly as possible, and with that thought in mind, if you can possibly do so, it would be appreciated if you will submit a suggested opinion of written expression of your views within the next week or ten days."

March 30, 1944, letter advising Special Judge Jones that I had prepared a tentative opinion and asked "if there is any particular reason why a conference should be held without further delay. I wish you would inform me."

Upon a conference a week or so later I submitted my opinion and delivered copies of the same to Special Judge Jones and Judge Barefoot.

On the following day Special Judge Jones stated that he would take time to prepare his opinion in the case and would submit the same at the next conference.

May 2, 1944, In Re Jenkins v. State, No. A-10,235, I addressed a letter to Special Judge Jones, among other things stating: "I would like for you to name a date for final conference this week or next, if it suits your convenience." Answering the same Judge Jones stated among other things: "I will make it a point, however, to meet with you sometime during the week of May 15."

May 22, 1944, I addressed a letter to Judge Jones, stating:

"I wish you would find it convenient some day this week for a final disposition of the above entitled cause. If so, please advise me as to when." No Response.

June 27, 1945, case assigned for conference on July 3, 1945.

June 29, 1945, plaintiff in error's application for

disqualification of Judge B. B. Barefoot and Special Judge Lawrence L. Jones, presented to Clerk of the Court.

July 2nd, without notice to writer ordered filed as of June 29, 1945, and also order entered overruling application of disqualification.

July 2nd, without notice to writer, majority opinion filed with the clerk of the court.

Deleting the syllabus, also changing and correcting two or three pages to conform showing the same to be a dissenting opinion, my opinion as submitted and delivered to my associates in this case is as follows:

The information in this case was filed in the district court of Okfuskee county, September 9, 1941, charging that in Okfuskee county, on or about the 11th day of August, 1941, the defendant, W. C. (Bill) Jenkins, then and there did kill and murder one Roy Bradburn, by shooting him with a pistol.

The record shows September 10, 1941, an entry of minutes of arraignment, omitting title, as follows:

"State appearing by Co. Attorney, Roy Parham; defendant appearing in person and by counsel, Stephenson and Stephenson. Defendant arraigned. Given until Sept. 11, 1941 to plead."

September 11, 1941, an entry of minutes of arraignment herein, as follows:

"State appearing by Co. Attorney, Roy Parham; Defendant appearing in person and by counsel, Stephenson and Stephenson.

"Defendant arraigned. Waives reading of information and enters plea of not guilty."

That thereafter, on September 22, 1941, the defend-

ant filed his affidavit for a continuance, omitting title, as follows:

"I, W. C. (Bill) Jenkins, of lawful age, being first duly sworn upon oath states:

"That I am the defendant in the above styled action. That I cannot safely go to trial in said cause on this date because of the lack of material evidence which I have not been able, with due diligence, to obtain, in this to-wit:

"That this defendant caused to be issued a subpoena for one Vess Fuquay; that no service has been had upon him and he is not present in court. That, if said witness were present he would testify as follows:

"That he, the said Vess Fuquay, was a partner with Roy Bradburn, the decedent, in the horse and mule business. That on the day the decedent was killed he told said witness that he was going to kill Bill Jenkins, the defendant in this action. That he knows that Roy Bradburn carried a short barreled 38 caliber pistol and that he had said pistol in his right hand front pocket when said witness saw the said decedent, Roy Bradburn, and talked with him approximately 20 minutes before the decedent was killed . . . That he talked with him on the road . . . while decedent was on the way to the home of Nancy Seavers Bradburn from Weleetka. . . .

"That said witness will further testify, if present, that the said Roy Bradburn pulled a gun upon a group in the lot at the home of Nancy Seavers Bradburn approximately 60 days before the death of decedent, that the defendant was in said group, and that he threatened to kill the parties present at that time, including the defendant, herein, and that said witness, Vess Fuquay, persuaded the said defendant to quiet down.

"That said witness resides in Oklahoma County, Oklahoma in the City of Oklahoma City, the place to which said subpoena was issued, that said evidence is material,

is not cumulative and this defendant has endeavored to obtain the testimony of said witness and obtain his presence at said trial by the issuance of said subpoena, by the sending of persons to try to locate him, the attorneys for this defendant, on the 20th day of September, 1941, and has used every means within his power to obtain the evidence and testimony of said witness.

"That defendant cannot safely go to trial without said evidence and, if this cause is continued for the term, that he can have said evidence and obtain the testimony of said witness.

"Wherefore, defendant prays that said cause be continued for the term in order that he may have said evidence.

"W. C. Jenkins

"Subscribed and sworn to before me on this the 22nd day of September, 1941.

"J. R. Day.

"(Seal)                              Court Clerk."

It appears from the record, that the plaintiff in error, herein referred to as the defendant, was from the date of his arrest, on the day of the homicide, August 11, 1941, to the date of the approval of his supersedeas bond herein, December 4, 1941, and all during the intervening period, confined, either in the county jail of Okfuskee county, or in the penitentiary at McAlester, Oklahoma.

The record shows September 22nd, the state announced ready for trial and defendant announced that they are not ready for the reason that they were unable to locate material witnesses.

The court passes said cause until September 23, 1941, at 9 o'clock a.m.

The record further shows, omitting title:

"Be it also remembered that thereafter on to-wit the 24th day of September, 1941, the above entitled and numbered cause came regularly on for trial before the Honorable Arthur Cochran, District Judge, and a jury duly impaneled and sworn to try said cause."

Appearance:

Roy P. Parham, County Attorney,
D. A. Seran, Assistant County Attorney,
J. Hugh Nolen, Special Prosecutor,
                                Attorneys for the State.

Stephenson .& Stephenson, Okemah, Oklahoma,
Walter Billingsley, Wewoka, Oklahoma,
                                Attorneys for the Defendant.

"A jury is duly impaneled and sworn, the witnesses are sworn and, upon the request of the defendant, placed under the rule, except the character witnesses, and the case proceeds as follows, to wit: The Court: State your case for the State. Opening Statement in Behalf of the State: By Mr. Parham: The Court: Do you want to make your statement for the defendant now? Mr. C. Stephenson: Yes, sir. The Court: Go ahead."

That thereafter, September 25, 1941, the jury returned their verdict finding "the defendant guilty of manslaughter in the first degree and fix his punishment at imprisonment in the State Penitentiary for a term of 15 years."

September 29, motion for new trial was filed. On October 4, 1941, motion overruled and judgment rendered in accordance with the verdict.

To reverse the judgment an appeal was perfected by filing in this court on March 20, 1942, the petition in error with case-made.

The state's first witness, Beryl Stevens, testified: "I live at Weleetka, employed by the Douglas Funeral

home, I am not a licensed undertaker." That he assisted in embalming the body of Roy Bradburn and identified pictures of the deceased taken at the morgue on the following day, and identified a shirt taken from the body.

Floyd Staggs testified:

"I am a city Policeman in Weleetka. On the 11th day of August, 1941, Bill Jenkins walked up to me and Jim Griffin in Weleetka, about 7 p.m., we were in front of the bank and said he had killed Roy Bradburn with a revolver, and it was here in his car, his wife was sitting in the car. The pistol was on the seat of the car, which I now identify as State's Exhibit 'D.' I took the defendant to Okemah and gave the gun to the county jailer."

He further testified as follows:

"Q. Did he tell you at that time or later why he had killed Roy Bradburn? A. Yes. Q. Tell the jury what he said about that? A. He said he had abused him and that he had took all of that he could stand. Q. Did he tell you whether or not Roy Bradburn had made any move to kill him? A. Not at that time. Q. Did he later on? A. Said he had threatened him twice that day. Q. Did he tell you how? A. Yes, sir, said he drew a gun on him twice."

On cross-examination he stated:

"Q. He knew you were an officer when he came to you? A. Yes, sir. Q. And as you were coming to Okemah, he knew you were a deputy sheriff bringing him to put him in jail for killing Roy Bradburn? A. Yes, sir."

Jim Griffin testified:

"I was at Weleetka when Bill Jenkins surrendered to Floyd Staggs. In about 30 minutes I went to Roy Bradburn's place. Lee Carter was there and some other fellow. I saw four bullet holes in the body, it did not appear to have been moved since falling."

Lee Carter testified:

"I live at Weleetka, I have occupied the position of deputy sheriff for three years, I first learned of the shooting over the telephone, that Roy Bradburn had been shot and went out there. Jim Griffin, Hack Gwinn and P. A. DeMoss were with me, a man and his wife by the name of Conley were there when we arrived, I notified Judge Blackburn a justice of the peace and he impaneled a jury, I am familiar with the position of the house where Roy Bradburn lived and the house where Bill Jenkins lived, and the barn and the pasture. The Bradburn house is near the section line, running north and south and the barn is south and west of the house, I judge 150 feet from the house to the barn and there is a gate that goes out to the south. The house occupied by the defendant is about 40 feet south of the house Roy Bradburn lived in, the defendant's residence has an upstairs window on the west side of the house, the body of Roy Bradburn was, I judge about 100 or 150 feet from the gate. There are two gates in the barn lot facing east, there is also a gate leading out of the pasture towards the defendant's house, that would be back west of the barn, there is a gate down there, the ground was not disturbed around the body."

Nancy Bradburn called as a witness testified through an interpreter to translate the questions propounded by the attorneys and their answers in the Creek language.

She testified:

"I am the widow of Roy Bradburn who died August 11, 1941, near my house, behind the barn. He left home that morning about 6 o'clock but I didn't see him leave. Bill Jenkins left home that morning and returned about 3 o'clock, Roy, later that afternoon, it was about 6 o'clock. He stayed in the house and read some newspapers to me while I was on the bed sick with a headache. He said he was going to feed the hogs, I asked him, 'why didn't he get the hired hand to feed them?' and he said he would

go and feed them himself. I didn't know whether Roy had a pistol or any other weapon when he left the house. Later I heard several shots. I just thought Roy was shooting at snakes or something, until the little girl, Nancy, told me what happened, and I went immediately to where he was lying. Frank, the hired man who farmed the place was with the body and stayed until Mr. Carter arrived. I have no idea about the length of time which intervened between the time Roy walked out of the house until I heard the shots. I did not know that Roy had a little sawed-off shot barrel pistol but he had a shotgun and a pistol; also another pistol which he never used, I gave that pistol to the officers. He 'carried the other one all the time,' he carried it in his car and at times in his pocket, after he was killed I saw the gun in the little compartment in the front of the car where he always kept it; Lee Carter and Mr. Barton were with me when I saw it, I had not seen it before since Roy left in the morning. Roy did not speak the Creek language, my daughter, Sukie, Bill Jenkins's wife had three children when I married Roy Bradburn, about six years ago. My daughter, Sukie, now has four children."

Charlie George testified:

"I live at Weleetka, on the day of the homicide in question I went to his place and saw the body about 150 yards west of the house in a little pasture. One of my boys, Bill Pate and Joe Wapoo went with me. It was around 7 o'clock. We were among the first who were there, Mr. Carter, and another man, were there. Later a coroner's jury was impaneled, I was a member of that jury. I observed three wounds on the left arm and one up on the left side of the face, and one on the right side of the head. I searched his pockets, took his billfold, his knife and 61 cents in change. Jim Griffin took the stuff out of his shirt pocket. I was there when Murray Barton came down from Okemah, we found four or five shells scattered around four or five feet from the body. Mr. Barton took possession of them. We found some tracks

to the left of the old road in some weeds, something like twenty feet from the body. There had been several people walking around there and you could not tell one track from another. I do not know who or how many people were there before me, or what had been in his pocket before they searched him."

J. W. Kennedy testified:

"I am and have been sheriff of Okfuskee county, for about 9 years. I have known Bill Jenkins for quite a while. I saw him about midnight, August 11th, in the county jail. Sullivan Thompson, Murray Barton, Dane Seran and Harry Flanders were present when he made an oral statement to me prior to making the one that was reduced to writing. He said that he told his wife, after returning home that day, that he had had trouble with Roy Bradburn, and he said that he walked with an automatic pistol in his belt down the road, and when Roy came back he asked him, 'Why did you do me the way you did this morning?' and fired a shot and hit Roy in the left temple, and shot him six times as Roy was falling. He said he came to Weleetka with Roy that morning and there he got some one to bring him to Okemah. I asked him why he didn't come and tell us about his troubles and he said he was up here and said he went to the county attorney's office. He said there was none of them in. I asked him why he didn't come to the sheriff's office and he give me no explanation. I asked him where he went next and he said he was down to Lawyer Stephenson's office. I asked him if he told them about it and he said, no. I asked him if he had trouble why didn't he explain it to somebody and let them help him."

Asked: "Did he say anything to you about leaving the country? A. Yes, sir. Q. Tell the jury what he said about that? A. He said that if connections had been made, he would not have been here, that Clem Stephenson was to bring a car and have it there at 5 o'clock that evening. He said the car didn't arrive. I was down at

Roy Bradburn that afternoon. It was before the statement, they had done sent for the judge, the justice of the peace and coroner when I got there. Sullivan Thompson went with me. I saw Clem down there that night, after the judge and jury had gone. He was a little north and a little east of the house. I got back to Okemah somewhere around midnight and went to the jail to talk to Bill Jenkins. Later on he made this statement which was taken down in shorthand and later transcribed. I do not know whether or not he was sworn before he made his statement. Handing you state's exhibit "E," I will ask you to state what that is, if you know. A. That is the statement that Bill Jenkins made. Mr. Parham: We offer this in evidence. Mr. Billingsley: We join in the request. The Court: Let it be admitted."

On cross-examination he stated:

"Clem Stephenson was the first person I saw. He asked if it would be all right, since he represented the defendant, for him to see him up there in the jail. Sullivan said that Clem had been trying to see the boy. I told him we were not through with the investigation, and I told Clem nobody could see him until we got through. Afterwards he was taken to the county attorney's office and the statement that was taken in shorthand was made in the kitchen of the jail. I sat there and heard the statement. Nobody talked with Bill Jenkins from the time I first talked to him until he made the written statement. He was not scared, we never mistreated him. I know that early that morning he started in the car with Roy Bradburn to Weleetka. He told me that on the way Roy Bradburn reached down under his left leg and got a pistol. He told me that after he got to Weleetka, he came on to Okemah and went to the county attorney's office, about some trouble they had that morning, he never did tell me what the trouble was."

Asked: "Didn't he tell you that Roy Bradburn told him that morning that if he came back to Nancy's place he would kill him? A. No, he didn't tell me that in the

first statement. Q. You heard him in the statement that the stenographer took down and transcribed. And it is in there? A. Yes, sir. I have known Roy Bradburn 20 or 25 years. I knew him when he had a livery stable in Weleetka, I knew he married Nancy."

L. S. Thompson testified:

"I am undersheriff, and was such on August 11th, 1941. I knew Roy Bradburn for 12 or 14 years, and I have known Bill Jenkins 7 or 8 years. I went with the sheriff down to his home. When we got there they were impaneling the coroner's jury."

That he saw Bill Jenkins that night and heard him make a statement, and he also heard him make a statement later on that night that was transcribed and signed by him. His further testimony is substantially the same as that of the sheriff.

Murray Barton, being called as a witness for the state, testified:

"I live in Okemah, I have been deputy sheriff about 11 years. I knew Roy Bradburn about 15 years, and I also knew Bill Jenkins before this trouble arose. Mr. Stephenson: May it please the court, the defendant is not present. The Court: I hadn't noticed that. Call the defendant. I am used to depending on the officers to do exactly what they ought to do. They have just overlooked bringing him down here. I don't think Murray has told them anything except how long he has served as an officer, anyway. Thereupon the defendant, W. C. (Bill) Jenkins, is brought into the courtroom. I have been acquainted with Bill Jenkins 6 or 7 years maybe. I think it was shortly after 7:30 that the report of the shooting came to me. I told the jailer to get in touch with the sheriff, I drove as fast as I could drive, it is about 18 miles from Okemah, and I drove it in 10 or 11 minutes, there were several out there, including Mr. Carter and Jim Griffin and Charlie George. I looked

around and found five shells, they were probably four or five feet south of his feet. I went to the house, Mrs. Bradburn showed me where the gun was located, I got one gun, a 45 automatic, I asked her if there was another gun, and she said: 'Not in the house, there might be one in the car,' and we went to the car. She went with us and found another gun in the car, a 38 Colt, snub-nosed pistol, that had a short barrel, an inch or inch and a half long, a six shooter. I came back to Okemah, went to the jail. Here met the sheriff, and undersheriff and Mr. Seran. In the conversation they had with the defendant he made a statement concerning his activities that day and how this was committed, according to his story, and later made another statement that was reduced to writing."

His further testimony as to the statement was substantially the same as that of the other officers.

He further testified:

"I saw Roy Bradburn that day and went with him to where he had some horses and mules, over on the south side of Main Street, in Okemah. I was with him from 11 to 12:15. In a conversation with him, he discussed Bill Jenkins. I saw him again at 7 o'clock that evening, was with him about 30 or 40 minutes in Weleetka. Harry Davis, the highway patrolman, was with him, that was about 7 o'clock before he was killed some time between 7 and 8."

On cross-examination he stated that he arrived at the scene of the homicide just before sun down.

State's Exhibit "E," admitted in evidence, is as follows:

"State's Exhibit E.

"State of Oklahoma
"Okfuskee County, ss

"Statement of Bill Jenkins:

"I, Bill Jenkins, of lawful age, being first duly sworn, state under oath that I have first been advised by the Assistant County Attorney, Dane A. Seran, that I am entitled to a lawyer and that statements made by me could be used against me, and that I am not compelled to make any statement, but that he desired that any statement I made be free and voluntary and without any promises of immunity or leniency. After having been so advised, I answered the following questions in the presence of Sullivan Thompson, Undersheriff, Murray Barton, Field Deputy, Harry Flanders, Jailer, J. W. Kennedy, Sheriff, C. H. Ryals, asked by Mr. Seran and reduced to writing by Sadie White. Mr. Seran: Q. Bill, I understand you had a little trouble down there this afternoon? A. That's right. Q. Start in in your own words and tell us what happened? A. Well, that's all I'll tell you is the truth. Well, this morning I was out feeding the chickens and my wife was fixing to take the laundry to town, she asked me if I wanted to go and I said yes. Roy backed his car out and the pigs was out. He stopped and come by me and drove the pigs through the gate by me, he comes back by and asked did I want to go to town. I told him yes, my wife was going, but I would ride with him. We got up the road about a half mile and he lit in on me, bawling me out about going to Muskogee, said that we employed a lawyer to fight him and H. G. House. I told him we didn't. Got on down road further and he said I'd caused him more trouble than anybody, I told him I hadn't. He had a gun sticking under his leg and he reached down and got it with one hand, he looked over at me said, 'I've got enough of you, if you have anything again me I want you to get on me.' I said, 'Well, I'm twenty-one, I guess I could get on you if I wanted to.' He told me

to hush and I hushed and sat there silent about three-quarters of a mile, he was doing all the talking, by that time we was at the highway and a car was coming. I said, 'Watch out Roy, that car,' he went right on out on the highway, said 'There's a bunch of long tailed rats in town I'm going to get even with.' Said I was one of them, said he used to think I'd do, but I wouldn't, he knew it now. I asked what was the matter, so when we got to town I got out, didn't say any more. Q. Here in Okemah? A. No, sir, Weleetka. Q. Where did you get out? A. Right there by Bole's Drug Store and walked up to the Bank. I was so mad and so strung up I was just about to fall over, I leaned over against the Bank, stood there a long time. Q. Did you talk to anybody? A. No sir, Roy went in the drug store and came out and walked by me, didn't say nothing, I didn't either, he went on around, I guess he went on around to the side door at the back, when he did I walked across the street and went on to the post office. I stood there about five minutes and there was a bunch of boys there, I said good morning to them. Roy drove up to the curb and got out and walked by me and didn't say nothing. I didn't either. I stepped across the street and told Lillard Puckett I wanted to come to Okemah. Some call him L. D. Puckett, he said his car was broke, but he would borrow one, he borrowed Standley Munion's car. Well, I went up to Clem Stephenson's office, he was busy and told me to come back. I come up in the prosecuting attorney's office and asked the lady where was Mr. Parham and she said he was on his vacation and said Mr. Seran was around. I told her I would be back later. Well, I went on back down to Stephenson's office and told Clem, I said, 'You told me you wanted me to go to Hannah to see about keeping down court costs.' I said, 'I need a car.' He asked what I figured it would cost and I said around $200.00 and he said a Ford and I said yes. He called a salesman from Seminole said be at my house at 5:00 o'clock, but they wasn't and my wife was in the house talking to her Mother when I got home. Q. How did you go home? A. Walked part of the way from We-

leetka and Lloyd Reddick picked me up, had two little girls. Q. How did you go from Okemah to Weleetka? A. Less Carter, I called my wife and kids down stairs and told her how Roy done, she said let's go in here, I said no, upstairs so the kids won't hear anything, I told her what he said and what was liable to happen. Q. What did you tell her was liable to happen? A. I was liable to kill him or he would kill me, she said, 'You haven't got nothing to kill him with.' I said, 'That's what you think.' I had laid my gun under a shirt on the dresser, and I pushed the shirt back and said, 'There it is.' Well, I stood there with my head down and thought a long time. She said 'Rather than for you and Roy to have trouble, I'll kill him when he's asleep.' Q. Sukie said that? A. Yes, I said 'No, you are a woman and me a man,' I said, 'I'll do it, I don't care what kind of punishment they put on me.' When Roy came in she went to crying and I went out the door and she said 'Where are you going?', I said 'Going down here.' She said 'Roy's liable to kill you,' I said, 'I don't care if he do.' So I went on down there, to the pasture. Q. Where was that? A. Down in the pasture. Q. Did you watch Roy go feed his hogs? A. He went down to the tank, I was standing upstairs, you can see all over the place, so I waited till he started back, didn't want to walk up behind him, when he started back I stepped downstairs and went on, meeting him, when he got pretty close, well I sat down, had the gun sticking in my belt with safety off, sat down just like that (Hunkered down) when Roy got about as far as here to that man. Q. About eight feet? A. Yes, I said 'why did you abuse me this morning,' and he pitched another fit. I told him, I said 'Well, I guess you think I'm going to get up and walk off and leave my wife and babies?' Q. You still sat there? A. Yes, he stepped back and run his hand in his pocket and said, 'We'll get this over right now, I told you not to come back.' When he stepped back and put his hand in his pocket I just up and shot as I was getting up. Q. How many times? A. Six, the first time shot him right here (Left temple), next time right here, I thought (under right

eye). Q. Did he fall down? A. He was almost to the ground when I made the fourth shot. Q. He was laying on the ground when you fired the last two shots? A. Shot him right here and there (chest and stomach) and when he turned and went to fall then I shot him in the side twice. Q. How many shots did you fire after he was on the ground? A. None. Q. Shot them all before he hit the ground? A. Yes. Q. Where did you get that gun? A. Harkey's when they run that ten cent store at Weleetka. Q. How long ago? A. Eight years ago. Q. Did Sukie know you had it? A. No. Q. Where had you been keeping it? A. There at the house. Q. Did Clem show up with the automobile? A. No, sir. Q. How long had you been planning on buying this car? A. Today. Q. After talking to Roy? A. Yes, sir. Q. What was your purpose of buying a car? A. I was going away. Q. Going to leave? A. Yes. Q. What was your purpose in leaving? A. I knowed we would have trouble. Q. You wanted the car so you could leave if it did happen? A. I was just going to drive away. Q. Before the trouble or after? A. Before. Q. You told Sukie before you went down there you was going to kill him? A. Or him kill me one. Q. You was going down there and have it out? A. Yes. Q. About what time was that? A. Something after six, I don't know the correct time. Q. Was anyone around there when it happened? A. No, sir. Q. How far was that from your house? A. Well, I imagine it would be about the distance of a block. Q. How far is that from where Roy lives? A. About the same. Q. The houses are close together? A. Yes. Q. What is this trouble about between you and Roy? A. Well, today it was about me seeing a lawyer at Muskogee, I don't know anything about it. I asked my wife about it, she said she and her mother were over there and Roy got on them about talking to a lawyer, but they didn't talk to no lawyer. Q. Did you see a gun on Roy at the time of the shooting? A. No, sir, I didn't. Q. Did he pull his hand out of his pocket? A. He never had his hand out. I turned and walked off. Q. Which hand was it? A. Right. Q. Which pocket? A. Right front. Q. Coat?

Did he have on a coat? A. No, sir. Q. Shirt sleeves? A. Yes. Q. Did you see the outlines of a gun in his pocket? A. I didn't see a gun. Q. But when he started in his pocket you started firing? A. Yes. Q. When you were riding you say Roy put his hand on a gun? A. Yes. Q. Where was it? A. Right here (Under left leg). Q. Under left leg? A. Left leg, I was on his right side. Q. You saw that gun? A. Yes. Q. What kind was it? A. Looked like a 38 Smith and Western. Q. Did he pick it up? A. He didn't pull it on me, just had his hand on it. Q. How long was that gun? A. Looked about that long (Approximately 7 or 8 inches). Q. What had Roy done with that sack he was carrying the stuff in when you shot him? A. He throwed it down. Q. When did he? A. Before he reached in his pocket. Q. He came up carrying it in his hand? A. Yes. Q. Which one? A. Left. Q. You married Sukie Seavers, used to be, her name used to be Seavers, you are married to her now? A. Yes. Q. Roy's wife's sister? A. Daughter. Q. You and Sukie have any children? A. Two living and one dead. Q. How long have you been married? A. Twelve years. Q. Did you discuss this trouble with L. L. Puckett? A. No, sir. Q. Discuss it with Lee Carter? A. No, sir. Q. You knew Lee was an officer, you knew where Mr. Kennedy's place of business was here, you, Clem was your lawyer, did you discuss it with him? A. Didn't discuss it with anybody but my wife. Q. Just your wife? A. That's all. Q. When did you make up your mind to kill him? A. I had it in my mind, but didn't exactly make up my mind till my wife said what she did about killing him in his sleep, I said 'No, I'm a man.' Q. That's when you told her you would do it regardless of the punishment they gave you? A. We was going to have it out, either him or me. Q. What about that statement you made just awhile ago about the punishment you might get, you just told us, what were your words? A. I meant he might get me, he's better on the trigger than I am. Q. In other words, what you said, or what you had in mind was to go down there if necessary and shoot it out with him, and the best man win? A. Yes. Q. You

told Sukie you were going down there to kill him? A. I said him or me. Q. In other words, you meant to kill him if he didn't kill you, where did you buy those shells? A. Old, part of them were and part of them new. Q. Where did you get the new shells? A. Henryetta. Q. Where? A. On the right after you go by the picture show. Q. What did you pay for them? A. Seven cents apiece. Q. How many did you buy there? A. I think I bought six, I don't think I had but four of them in the gun. Q. Have the others in your pocket? A. Yes. Q. After shooting, did you reload? A. No, sir. Q. Did you shoot it empty? A. Yes. Q. Just had six shells in the gun? A. Yes. Q. A while ago when you first made a statement, you said when you went down there you were sitting down and Roy came up, you said he had a fit, what do you mean by that? A. He went to talking and jumping around and almost crazy looked like to me. Q. What did he say? A. A little bit of everything. Q. What do you remember him having said? A. He told me we was going to have our out and out if I didn't like what he said. Q. What did he mean when he said 'What I said'. A. What he told me this morning. Q. Could he see your pistol from where he was standing? A. I don't think so. Q. You were sitting down, hunkered down with the safety off? A. Had my hand on the gun. Q. The weeds are high there, when did you take that safety off of the gun? A. Took the safety off the gun before I got to Roy. Q. Before you left the house? A. When I went through the barn gate. Q. How far was that from the point where you had the shooting? A. I judge it being about half a block. Q. Did you see Roy all the time you were walking down there? A. Yes. Q. When you left the house you saw him and saw him all the way down there and got about half way you took the safety off? A. Yes. Q. Roy took some corn to the hogs and came right back. A. I was looking out the window, but never went out till he started out, I wanted to meet him face to face. Q. You went down there and sat down, hunkered down by the side of the trail? A. Right in the trail. Q. You hunkered down and waited for him

to come up? A. Yes. Q. You are positive that is the gun you bought from Harkey? A. Yes. Q. You understand this statement you are making here is taken in writing? A. Yes. Q. You are telling the truth, we want you to tell the truth, we are not promising you anything. A. Them words that is down I said them. Q. What you say is the truth? A. Yes. Q. You understand that this statement can be used against you in this case? A. Yes. Q. Knowing all those things you were still willing to make this statement? A. Yes. Q. Where were the children when you were talking to Sukie? A. Downstairs. Q. You were upstairs before you did any talking? A. She said she was up to the big house talking to her mother, I went in the back, met Nancy, her mother, I said 'Where's Sukie?' and she said she was sitting on the bed and she told Sukie I wanted her to come out and we went on upstairs and talked this over. I told my wife I wanted some icewater and she made some, she said her mamma asked what was the matter, but she didn't tell her. Q. You didn't talk to Nancy? A. I told Sukie not to tell Nancy or the kids. Q. How long did that conversation last? A. I got home about five, right after or at five, she was about ten minutes making the water and she come on upstairs and we stayed until about six-thirty. Q. Did you discuss anything else besides this matter? A. No, when I seen Roy I just got up and stood there with head down. She asked what was the matter and I told her me and Roy was going to have it out, he might get me, I might get him. Q. Were you waiting there for Roy and watching out the window to see when he drove up? A. Yes. Q. How long did Roy stay in the house before he came out? A. When I saw him I heard him holler out at the barn, calling the hogs. Q. He was at home, his car was home when you got home? A. No, sir. Q. He come in after you got home? A. Yes, sir. Q. About what time was it when you left up here? A. Just about twelve I guess cause when we got to town Carter stopped there by the pool hall and said 'I'm going to dinner.' Q. What did you do after you shot him? A. I turned around about the time Roy hit the ground good, I walked

on up to the house and called my wife and she was still upstairs and she came to the door crying. I said for her to come and take me to town I had shot Roy and want to go give up and she said 'What did you do with the gun' I said 'I'm going to take it.' She took me on to town parked there by Mack's Cafe, I was looking for Mr. Carter but Jim Wickham and Floyd Staggs was leaning against the bank. I said, 'Mr. Staggs, I have shot Roy and want to give up.' He said 'Sure enough?' and I said 'Yeah.' He said 'Where is the gun?' I said 'In the car.' He said 'Let's go get it.' We went down there and my wife handed it to me and I gave it to him. Q. You didn't tell anybody but your wife till you got to town? A. No, sir. Q. You don't have any car of your own? A. No, sir. Q. What did she take you to town in? A. Nancy's, her mother's car. Q. You know whether Sukie told Nancy about the trouble you was going to have? A. She didn't tell her, she wanted to, but I didn't let her. Q. If I understand it Bill, what happened was that over a period of years of constant aggravation coupled with what happened today built your mind up to the point where you felt there was just one way to take care of the situation, just go down there and kill him or get killed yourself? A. Just like I told you the trouble started when he got out of jail, I just told you what happened today. Q. Go ahead and tell us what happened? A. Well, I don't know, all that is in the past, but Roy started to shoot me one time with a Winchester, along in the winter, said he was going to kill me and Clem and Harry Stephens. Q. How long ago? A. Must have been in February. Q. Did you ever tell Clem and Harry that? A. Yes, Clem said, 'I'll put that down, if Roy ever kills you, I'll produce it for evidence,' I don't know whether he ever did or not.

"I, Bill Jenkins, of lawful age, state under oath that I have read the foregoing series of questions and answers and state that they are true as I verily believe.

"Witnesses to statement: J. W. Kennedy, L. S.

Thompson, M. M. Barton, Harry Flanders, D. A. Seran, C. H. Ryals and Sadie White.

"Bill Jenkins

"Subscribed and sworn to before me this 12 day of August, 1941

"(Seal)                                    H. D. Moren"

When the state rested its case, the defendant interposed a demurrer to the evidence, and the same was overruled. Exceptions reserved.

William Jenkins, the defendant, as a witness in his own behalf testified. The transcript of his testimony covers over 80 pages of the record. A substantial statement of the same will appear in this opinion. Following his testimony, the following witnesses on the part of the defense testified in substance as follows:

Haskell Winn testified:

"I have lived in Weleetka 31 years, and on several occasions since 1936 I have seen Roy Bradburn carrying a gun in his bosom, near the pit of his stomach. I have seen him in a barber's chair with it on and have been with him in a car when he had it on. I have seen him some ten times with it in his right pants pocket. I did not tell Bill Jenkins that."

The court excluded this testimony.

He further testified the reputation of Roy Bradburn in the community in which he lived as being a dangerous, aggressive, quarrelsome and turbulent character was bad. "I heard practically everybody in Weleetka say so, including Perde Demoss, Luther Hale, Taylor Lockhart, Wes Watts, Lloyd Wilson, and many others. I have heard him eat a few out and cuss them. I saw him have trouble with a boy in Weleetka named Dolly Palmer over $50, and reach for his pistol, a .38 caliber."

Bill Sutton testified:

"I have lived in Weleetka 40 years and knew Roy Bradburn 15 years. His general reputation in the community where he lived as being an aggressive, dangerous, quarrelsome, abusive, and overbearing individual, I would call 'bad.' I, myself, was convicted of a crime in 1915."

Wes Watts testified:

"I am 24 years old, I live near Weleetka, and worked for Roy Bradburn in 1936, 1938, and 1939, and have had trouble with him. I was going home and he stopped me, him and Nancy, and he jumped out of the car and commenced cussing me for this and that, and I got out of the car to talk to him, and he jumped back in and drove up the road a little ways, got out and started in again and reached in and got his pistol, I started toward him and Nancy hollered for him to come on, and he jumped in the car and went on. He just took out his gun and put it on the car seat. Mart Brown, B. C. Tiger, Oliver Wise, Edith Tiger, Lucy Tiger, and Pansy Watts were there. I told a few, including Bill Jenkins about it a day or two later."

R. E. Raddick testified:

"I have lived in or near Weleetka all my life, 47 years, I know nearly everybody in that community of Weleetka, and knew Roy Bradburn twenty years, and knew his general reputation in that community for being dangerous, overbearing, turbulent citizen to have been bad."

W. P. Raddick, testified:

"I am 65 years old, was a county commissioner of Okfuskee County for four years, now live a mile north and three miles east of Weleetka. I have lived in that community 48 years. Knew Roy Bradburn 25 or 30 years, and knew his general reputation down at Weleetka for being a dangerous, overbearing, quarrelsome, turbulent person was 'not too good,' some ways it was bad; and some it wasn't. It was bad as being a dangerous and overbearing man."

L. H. McDermott testified:

"I have lived in the Weleetka community about 30 years. Asked: Did you know Roy Bradburn's general reputation in that community as to being a quarrelsome, turbulent and overbearing person? A. Yes, sir. Q. Was that reputation good or bad? A. Bad."

T. D. Knowl testified:

"I am 70 years old, I have lived and been in business in Weleetka 26 years, and knew Roy Bradburn 15 years, and knew his general reputation in that community for being a dangerous, overbearing, quarrelsome and turbulent person, and that reputation was bad."

John Maddox testified:

I live about two and a half miles east and a mile North of Weleetka; on Sunday morning, the day before Roy Bradburn was killed, I was there at his place and bought a yearling from him and left it there; on Monday evening I was on the Sim's farm and saw Roy Bradburn rounding up some hogs, I judge it was between 6:30 and 7:00 in the evening. I talked to him about getting this calf, and asked him where it was; he said it was right up this draw east, I was not on the Bradburn farm. After I was talking to him he went back toward his barn; I saw him meet some one, and a shooting occurred. I saw a man come out of the lot gate, he was maybe 175 yards from where I was, and he either sat down or hunkered down, I could not be positive which and I saw Roy walk up, I would say as far as from here to the wall and stop, it seemed like there was a conversation. Mr. Parham: Object to what it seemed like. The Court: Sustained. Just tell what you saw? A. Roy taken a couple of paces backwards and when he did there was a shooting started. There were six shots. When the first shot started Roy went lunging toward this fellow and kept going I would say until the fourth shot reeled him and the fifth and sixth shot he went down, and it looked to me like he was in some five or six feet of this fellow that was doing the shooting."

On cross-examination he stated:

"I live two and a half miles east and a mile north of Weleetka. After the shooting I went from where I was standing to the section line highway running north and south, stopped about 30 minutes, and then went home. I first told Bill Reddick, the evening following, where I was when the shooting occurred. There was a couple of women came out of the house to where he was shot and stopped, and it was but a few minutes until a man came there."

In rebuttal, Bill Reddick, being called as a witness in behalf of the state, testified:

"I know M. Maddox who just preceded me as a witness. He did not tell me about seeing the homicide until some day last week. He never did tell me anything about it before."

The record shows (C.-M. 139):

"Mr. Parham: At this time the state rests. The Court: Call the first witness for the defense. Mr. Billingsley: Comes now the defendant and demurs to the evidence offered on behalf of the state for the reason that the same wholly fails to support a conviction of a charge of murder or manslaughter or the violation of any other of the criminal laws of the State of Oklahoma. The Court: Overruled.

"Mr. Billingsley: Exception."

### Opinion.

The conviction rests entirely upon the extrajudicial admissions of the defendant while under arrest in the county jail at Okemah, and his uncontradicted testimony as a witness in his own behalf, wherein he admitted the killing of Roy Bradburn, but claimed that it was justifiable in his necessary self-defense and in defense of his family and of his domicile.

In order to present understandingly the propositions of law urged for a reversal of the judgment, it is necessary to state enough of the salient facts in evidence and proceedings had upon the trial to present the issues upon which the case was tried.

The first assignment of error is:

"Error of the court in refusing to allow the defendant to present evidence in support of his defense which evidence was offered and witnesses produced and they were not allowed to testify by the court as to the matters known to them which evidence so offered was a part of defendant's defense and was competent, relevant and material to which action of the court in refusing to allow said witnesses to testify the defendant duly excepted."

The undisputed testimony of the defendant as a witness in his own behalf shows that he is thirty years old; that in June, 1930, he married Sukie Seavers, a widow with two children, a daughter of Nancy Seavers, a Creek Indian, who resided two miles north and two miles east of Weleetka. and with his wife and family he had lived in a house along side of his mother-in-law's dwelling house since their marriage. That three children were born to them, a girl now eight years of age, and a boy coming seven, their other child died.

That he with his family, and the Bradburns lived in houses in the same curtilage or yard for about six years, before the homicide in question, which occurred near the barn, about two hundred feet distant from the dwellings.

The defendant testified that he knew the character and general reputation of the deceased in the community from 1934 as being a violent, dangerous, quarrelsome and turbulent man, and that the same was bad.

In substantiation of his testimony as to such bad

reputation he introduced the testimony of seven witness, who properly qualified and fully corroborated the testimony of the defendant as to the reputation of the deceased for being a violent and dangerous character. The state admitted this by introducing no evidence to the contrary.

The defendant testified that in 1936, Roy Bradburn tried to separate him and his wife and to take his children away from him, and put them in a state institution. This was also admitted by the state in its failure to deny it.

The defendant further testified:

"The first time Roy Bradburn came to Nancy Seaver's place was in November, 1934; returning after taking the kids to school one morning he stopped me and said, 'Bill, I am going home with you.' I said, 'All right,' and on the way there he said he wanted to marry my mother-in-law; he stayed there two days, was gone a day or two and came back. After he had been staying there a while there was some trouble and two or three men were shot. He was then asked: "Now, going back to the time when these parties came to visit at the house of Nancy, do you recall the night that they came out there, and do you know who it was that came?" Answered: Yes, sir, a part of them I did, I knew Josephine Birdcreek and her husband, there were ten in the party that came out to Nancy's that night; they arrived there at her home about 10 o'clock. The Court: I am not going to let you go into detail about that; but I will let you show that he knew about it. Q. Was there some shooting there that night? Mr. Parham: We object to that as incompetent, irrelevant and immaterial and no way to show reputation. The Court: Yes, that is what he is asking about. Mr. Billingsley: After I have proved this reputation, I am attempting to show that he knew about the general thing that occurred there. The Court: Objection sustained. Mr. Billingsley: Give us an exception; and we want to make the offer. The Court: All right. Mr. Billingsley: To which ruling of the court

the defendant excepts and offers to show that if this witness, the defendant, were permitted to answer, that he would testify that he was present at the home of Nancy Seavers some time in the latter part of 1934 when three or four parties came to the home of Nancy Seavers; that Roy Bradburn was there; that while these boys and girls were in said home of Nancy Seavers, Roy Bradburn secured a Winchester and slipped outside the house and fired through the window of said house, killing one of these boys or young men and wounding another; that the third one ran from the house and entered the automobile in front of said premises and tried to get away; that the said Roy Bradburn followed and shot this third person as he was attempting to back out in the yard; that he killed him instantly, shooting him in the head; and that this defendant was there present at that time and knew that the said Roy Bradburn had no cause nor excuse nor provocation for his acts in shooting said persons; that there had been no quarrel and no trouble between the said Roy Bradburn and the said persons that were shot and that the persons who were shot did not even know that Roy Bradburn was there present. Now, that is what the proof would show. That is what we offer to show by this witness. Mr. Parham: State's objection renewed. The Court: Objection sustained. Exception."

He further testified:

"I have known Lester Gann practically all my life, he came to work for Roy Bradburn at Nancy's place in 1936. Q. I will ask you if Lester Gann told you anything with reference to what Roy Bradburn had hired him to do to you. If he did, what did he tell you? The Court: I haven't understood when you fixed the time? Mr. Billingsley: In 1936 after he got out of his trouble. The Court: Sustained as too remote. Mr. Billingsley (out of the hearing of the jury): The defendant excepts to the ruling of the court and offers to show that the witness would testify, if permitted to do so, that the said Lester Gann, while he was working for Roy Bradburn in the early spring of 1936 told this defendant that Roy Brad-

burn had hired him, the said Lester Gann to kill this defendant, and had promised the said Lester Gann that he would give him an interest in a ranch somewhere in Oklahoma, the exact location of said ranch not being known to this witness and this defendant, for his commission for taking the life of this defendant; that the said Lester Gann told this defendant that he wasn't going to kill him because he had known him a long time and that he was going to take the gun, which the said Roy Bradburn had given him for the purpose of killing this defendant, back to the said Roy Bradburn, and that he did take said gun back to Roy Bradburn and told the said Roy Bradburn that he wasn't going to carry out his agreement to kill this defendant and left the gun, which was the property of the said Roy Bradburn, there at the home of the said Roy Bradburn. Mr. Parham: To which we object as incompetent, irrelevant and immaterial, too remote to have any bearing on the issues in this case. The Court: Sustained. Exception. Q. Now, after that you continued to live on your mother-in-law's property in your little home with Sukie and your babies? A. Yes. Q. Did you afterwards learn that Roy Bradburn had tried to influence other persons to kill you."

The state objects.

"Mr. Billingsley: I will show you who they were and the time and places; but I can't do it all in one question. The Court: He will have to fix the time and place. That is very material, I think. It is on the question of time I am sustaining the objection."

He further testified:

"I know Ott Strangfield for the past 13 years. He lived at Weleetka. About two years ago, sometime in 1939, I had a conversation with him, at his shop in Weleetka with reference to Roy Bradburn."

State's objection overruled:

"Q. Tell the court and jury what conversation you had in the year 1939 with Ott Strangfield with reference to Roy Bradburn?"

In the winter of 1939, at his blacksmith shop in We-leetka, what did he tell you?

"Mr. Nolen: The State objects as incompetent, irrelevant and immaterial.

"The Court: Well, in trying this case against the defendant, what difference does it make what kind of conversation he had with Ott Strangfield in regard to Bradburn in 1939?" (Thereupon counsel confer with the court out of the hearing of the jury.) The Court: The objection is sustained. Exception. Mr. Billingsley (out of the hearing of the jury): We expect the answer of the witness, if he were permitted to answer, would be that the said Ott Strangfield called this defendant into his blacksmith shop in the winter or early part of 1939 and told the defendant that Roy Bradburn had approached him, the said Strangfield, and offered to furnish him a gun and to pay him in money and in political favor if he would kill the defendant, Bill Jenkins; that the said Strangfield told him that he had refused to have anything to do with such a proposition; that after that the said Roy Bradburn had quit having any of his work done at his shop and wouldn't trade with him nor have his horses shod there anymore; that this defendant knew that something had occurred between the said Strangfield and Roy Bradburn, because up until shortly before his conversation with Strangfield the said Roy Bradburn and Strangfield had been close friends, and that he noticed that Bradburn never went around Strangfield's shop after that time. Mr. Parham: The state renews its objection. The Court: Objection sustained. Exception."

Thereupon the court adjourned until the next morning.

The defendant further testified that:

"About 6:30 a.m. on August 11, 1941, we started from our adjoining homes together, in Bradburn's car, to Weleetka. On the way Bradburn asked 'Why did I go to Muskogee and employ a lawyer to fight him and

Herb House about his wife's money?' I told him I didn't even know a lawyer at Muskogee. He said I was lying to him, that I did. I told him I didn't. He had a gun under his leg on the left hand seat, a 38 Colts with the barrel sawed off, it was two inches long, he had it in his hand, with the barrel pointed down, and advised me to get on him, and we could get it over with; he kept holding the gun and telling me to crawl on him, and he ordered me not to return to Nancy Bradburn's place. He said I had caused him more trouble than any one else in the world, and that he was tired of it, and that there was a bunch of long tailed rats, including me, in Weleetka that he was going to get even with and that if I ever returned to the house he would kill me and ordered me to tell no one what he said. This occurred about three quarters of a mile from the house. When we got to Weleetka I got out of the car and afterwards came on to Okemah. There I went to the county attorney's office, but did not see Mr. Parham, the lady in the office said he was on his vacation, I asked where was Mr. Seran, and she said he was out, but would be back by noon, I told her I would be back. I went back to Mr. Stephenson's office and while there arranged to have a car sent to his home that day for the purpose of going away, but it didn't arrive in time. I reached home that afternoon about five o'clock, my wife was not there, I started in to Nancy's house, and asked her if my wife was there, she said, 'yes,' I told her to tell her to come back to our house. I told my wife 'Let's go upstairs, I want to talk to you,' and I told her what happened that morning. I would imagine I stayed in the house about an hour and forty minutes, and I heard Bradburn calling the hogs, and I went down to talk to him, not to kill him, and was not afraid, though I thought it likely that Bradburn would try to kill me, as he had threatened to do, so I taken my pistol along for protection.''

He further testified as follows:

''Q. What did you do then? A. I stood and looked down on the floor and put my hands up on my head, like

that (indicating) and then I told my wife I was going down there and meet Roy. Q. What were you going to meet him for? A. I wanted to get an understanding why he thought I went to Muskogee and employed a lawyer to try to give him trouble. Q. You wanted to talk to him? A. Yes, sir. Q. Did you go down there to kill him? A. No, sir, I wasn't. Q. He had told you that morning not to come back out there? A. Yes, sir. Q. Were you afraid of him? A. No, sir. Q. Did you think he would likely try to kill you? A. Yes, sir. Q. What did you do after you told your wife you were going down and meet him? A. I had my pistol laying up on the side-board where we keep the clothes and one of the kid's shirts was laying over it and I reached under the shirt and got my gun and stuck it right here (indicating) and went on downstairs and went in the east gate at the lot and went on out on the south side, and when I got to that gate I pushed the safety off the gun and went on down the trail and Roy Bradburn was coming facing me. We were meeting each other face to face and, I didn't want Roy to see this gun, because he knowed I didn't tote a gun and if he saw it he would have knowed I wanted trouble; and when I got pretty close, about to those first people standing up there, I kind of hunkered down in the road with my hand over the gun and picked up a chunk and went on pecking on the ground in the middle of the road. Roy came up and when he got about as close as this gentleman stepped aside to the right and said, 'Roy why did you abuse me this morning?' and he looked at me and I said, 'Did you mean what you said this morning?' And he said, 'Yes,' I said, 'You think I am going to leave my wife and babies.' He said, 'You came down for trouble and you can get it.' He had a sack in his left hand and throwed this sack down and made two steps backwards and went for his right side, and I went to firing, pulling the trigger as fast as I could. Q. How many shots did you fire? A. Six. Q. Then what did you do? A. I turned around and went back to the house. My wife was upstairs and I told her to come down and take me to town, I wanted to give up, that I had killed Roy. Q. Why did you kill him? A. To

keep him from killing me. Q. Did you honestly believe if you didn't fire those shots that Roy Bradburn would kill you? A. I really did. Q. Bill, did you know that he had threatened to kill you before that, had people told you he had made threats against you? A. Yes. Q. From whom did you get the first information? A. C. L. Miller. Q. When was it and where was it that you received the information about Roy's attitude toward you? A. Down at Mr. Snell's place. In 1936. The Court: Objection sustained as being too remote. Mr. Stephenson (out of the hearing of the jury): This witness, if allowed to testify, will testify that C. L. Miller told him at the home of Roscoe E. Snell that Roy Bradburn had hired Lester Gann to kill him and to be careful. We offer to prove that, in 1936. The Court: Objection sustained as being too remote. Exception. Q. Now, after that did you hear again from any person that Roy Bradburn was going to kill you? The Court: Objection sustained. Q. Did you hear other threats that Roy Bradburn had made against you? A. Several of them. The Court: Objection overruled. Q. Did you have a conversation with Lester Gann in which he told you that Roy Bradburn had employed him to kill you? The state objects as too remote: Mr. Billingsley: If the court please, the case I handed you last night says those threats five years ago are admissible. The Court: Don't repeat the law before the jury. I am trying to get this case before the jury as I think it should be and I am going to do it if I can, regardless of you saying things here right out and trying, seemingly, to get things in that the court has ruled out. Mr. Billingsly: I am merely making a statement to the court. The Court: I know that; and you are trying to tell the jury what the law is. Mr. Billingsley: . . . I am addressing my remarks to Your Honor. The Court: You are addressing your remarks to me before the jury about the law. Mr. Billingsley: They don't pass on the law. The Court: Will you fix the time? Q. Did that conversation occur in the year 1936? A. Yes, sir. The Court: Objection sustained as being too remote. Mr. Stephenson: Note our exception. Mr. Billingsley: We object to the ruling of

the court and except to the ruling of the court and expect the answer to be, if this witness were permitted to answer, that he did have a conversation with Lester Gann early in 1936, in which the said Lester Gann told him that he had been employed by Roy Bradburn to kill this defendant, and that the said Roy Bradburn was going to pay in money and by giving him a half interest in a ranch; that the said Lester Gann told him he wasn't going to kill him, that he thought more of him, the defendant, than he did of Roy Bradburn. The state renews its objection: Mr. Stephenson: We further offer to follow this up with other acts continuing down to the killing. The Court: I haven't passed on that yet. The objection to the offer made by Mr. Billingsley is sustained. Now, what do you offer? Mr. Stephenson: Comes now the defendant and further offers to show that there were continuing acts on the part of the deceased, which started with the act of Lester Gann and continued up until the time of the deceased's death, in the way of threats and attempts to have him killed and threats upon the part of the deceased to kill him, and that is a part of the circumstances that continued until the time of the death of the deceased. The Court: I can't intelligently pass on the offer that is made, except by each act. I will pass on them as they are offered. Mr. Stephenson: Note our exceptions. Q. Did you have a conversation with Frank Mason in the spring of 1941 with reference to Roy Bradburn? A. Yes, sir. Q. And with reference to threats that Roy Bradburn had made against you? Objection overruled. The Court: Let him answer. A. Yes, sir. Q. What did he say? Objection that this is hearsay testimony. (Thereupon counsel confer with the court out of the hearing of the jury.) The Court: Objection sustained. Exception. Mr. Stephenson: We offer to prove by this witness, if he were allowed to testify, that he was going to Oklahoma City in a pickup with Frank Mason in the spring of the year 1941; that on the way to Oklahoma City Frank Mason told him that Roy Bradburn had tried to hire him, the said Frank Mason, to kill this defendant and that he wouldn't do it; that he told him to be careful when he was around Roy,

that he wanted to kill him. Objection sustained. Exception. Q. Now, Bill, you testified last night that you knew that Roy Bradburn had the reputation in that community of being a dangerous, overbearing man? A. Yes, sir. Q. And did you have knowledge of your own, outside of this information, that he was a dangerous man? A. Yes, sir. Q. And did you know of your own knowledge that he had killed two men and shot another one out there at Nancy's place? A. Yes, sir. The Court: Objection overruled. Q. And did you believe in view of what you knew of Roy Bradburn and his reputation and the things that you had known him to do and the things that he had said to you, which you have told the jury, that he was likely to kill you? A. Yes. Objected to as leading and suggestive. The Court: Sustained. Q. Did you believe, in the light of what had happened that morning before you fired these shots and in the light of the other things about which you have testified to the jury, that you were in danger of losing your life at the hands of Roy Bradburn? A. Yes. Q. And is that the reason you got that gun? The Court: Objection sustained. Q. Why did you take your gun when you went down to meet Roy Bradburn? A. Because I knew he was. Q. And did you think he was likely to kill you? A. Yes, sir. . . . Q. Immediately after you fired the shots you went and gave yourself up to the deputy sheriff of this county? A. Yes, sir. Q. He brought you to Okemah and .put you in jail? A. Yes, sir. Q. And you have been in jail ever since? A. Yes, sir. Q. Did you see Mr. Kennedy and Mr. Sullivan Thompson and Mr. Seran and Mr. Barton that night you were put in jail? A. Yes. Q. And did you make a statement to them that was taken down by the stenographer and transcribed?. A. Yes. Q. Did you try to tell them just exactly what had occurred out there Bill? A. Yes. Q. You didn't have anything to hide? A. No, sir. Q. Bill, do you love your wife and babies? A. Yes. Q. You want to stay with them? A. Yes. Q. Do you have any place else to go except your home out there? A. No, sir, not the way I was hooked up."

On cross-examination he stated:

"Roy Bradburn's hired hand at that time last name was 'White,' I don't know his first. I was feeding the chickens that morning when he invited me to go to town with him. He said, 'Bill, you want to go to town?' I said, 'Yes, my wife is going in to take the laundry; but I will go with you,' and I told her I would ride to town with Roy. I didn't know he was mad at me. After going half a mile he started the conversation, and asked me real rough, 'What did you want to go to Muskogee and hire that lawyer with Nancy to fight me and Herb House?' I told him I didn't do it, he said I was lying, I told him no, he said, 'If you got anything against me, I want you to get on me.' And he stopped the car and said, 'Get on me; get on me.' I didn't know he had this gun. I looked around and he had the gun, he put his hand under his thigh and got his gun in his left hand. From there on to Weleetka he quarreled about this matter. He did. I didn't. He told me to dry up and I did. He kept his hand on the gun all the way, I went to Mr. Stephenson's office and told his son I wanted a car, but I didn't tell him I was going to kill Roy Bradburn. My wife and three cousins had eight farms and owned one fourth each, and I wanted to go down and bring these boys in and have a compromise and save court costs. My wife had the money to pay for the car, and after making that agreement I went back to Weleetka with Mr. Carter, he is, I think, a deputy sheriff. It was 12 o'clock when we got to Weleetka, I talked to L. L. Puckett and told him that a man threatened to kill me this morning twice, and I don't know what to do about it, I hate to leave my wife and kids. He said, 'Don't do that.' Mr. Earl was standing there, I also told Austin Webb and his wife about 3:30, I was on my way afoot, and stopped and talked with them, and told them that Roy had threatened to kill me that morning. Taylor Lookhart, around 7 o'clock that morning, asked me what was the matter with me, I told him nothing, and he insisted on me telling him, and I told him what had happened. We were right south of the Bank in Weleetka."

On further cross-examination he was asked and answered the following questions:

"Q. What was your object in going down there? A. To talk this deal over that Roy had me accused of. Q. You wanted to take exception to it? A. I really wanted to make peace. Q. Why did you take this gun to make peace. A. I knew he carried one all the time and he was nervous and dangerous. Q. Take this gun and face the jury like you were. Now, just tell them—now, this is Roy and you were about that far apart. A. I said, 'Roy, why did you abuse me this morning like you did?' He looked at me and stepped about one step to the right and I said, 'You mean what you said this morning?' And he said, 'Yes.' I said, 'You think I am going to leave my wife and babies?' And he said, 'You come down for trouble and you can get it.' He threw the sack down and made two steps back and went for his right side and when he did I come up shooting."

Redirect examination:

"Q. Now, Bill, when you left your house and started down to meet Roy, did you think and believe he was armed? A. Yes. Q. You testified that you didn't intend to kill him, that you intended to protect yourself? A. Yes. Q. Had you ever seen him carry a gun? A. All the time. Q. It was his custom to go armed all the time? A. Yes. Q. Before you fired a shot he stepped back and reached for his pocket? A. Yes, sir. Q. What did you think he was going to do? A. I thought he was fixing to shoot me. Q. And do you still think he would have shot you if you hadn't shot him? A. I really do. Q. Had Roy Bradburn made threats directly to you before that morning with a gun? A. He had. Q. When? A. It was in February, 1941. Mr. Nolen: We object to that as incompetent, irrelevant and immaterial. The Court: Overruled. Mr. Nolen: Exception. Q. Where did that occur? A. At Roy's house. Q. Tell the jury about it. Mr. Nolen: Object as not proper redirect examination: The Court: Of course, that is true. That is not proper redirect ex-

amination. If you want to open it up, I will let you do it; but you open the case when you do. It is improper redirect examination. Mr. Billingsley: We would like to reopen. The Court: All right."

Direct examination:

"Q. Go ahead and tell the jury what occurred when Roy threatened you with a Winchester in February of this year? A. I drove up in the drive way one day about three o'clock and Roy stepped out— Q. Tell the jury again when it was. A. It was in February, 1941— And he had a Winchester in his hand and he looked directly at me with his gun like that (indicating) and says, 'You and Clem Stephenson and Harry Stephenson are trying to appoint a guardian of my wife.' I told him, 'No,' He said, 'Yes, you is.' I told him, 'No.' He said, 'I am a good-mind to go to Okemah and shoot them both down right in the office.' Q. Did he say anything about doing anything to you? A. No. Mr. Nolen: We object to that and move to strike it as not responsive. The Court: Sustained and the jury will not consider his answer at all. Exception."

Less Houk testified:

"I have lived in Okemah for the last 30 years, knew Roy Bradburn in June, 1941. This year, saw him at Max Scott's service Station in Weleetka. He showed me two guns, one an automatic and the other an ordinary revolver. He had the automatic in the right hip pocket and the revolver in the glove compartment in the car where he was sitting."

The state objects to the evidence given by this witness and moves to strike the same, in that it does not tend to prove any issue in this case.

"The Court: The objection sustained. The jury will not consider this testimony at all. Exception."

Sylvester Fugate testified:

"On August 11, 1941, I lived three miles north of Weleetka, and had been in the stock business with Roy Bradburn about seven or eight months. I saw him that day in several different places and had various conversations with him in regard to Bill Jenkins, with whom he said he had had a little trouble and argument that morning, and that he had told Bill that he didn't know the price of a sack of flour or nothing else, and that the rest of his life he was going to see that they didn't whoop off no more of Nancy's money. I have seen him with a pistol on him."

Charles McDermott testified:

"I have lived in Weleetka since 1909 and know Roy Bradburn and Bill Jenkins each about fifteen years. Roy Bradburn had a pretty bad reputation as a dangerous, turbulent, abusive and overbearing individual in the community in which he lived. I have seen him carrying a pistol. Mr. Stephenson: Now, if Your Honor please, I don't want to do anything improper and get anything before the jury except in a proper manner; but I expect to prove by this witness, and I want you to pass on it first, that Roy Bradburn talked to him less than a week before the time that he was killed and at that time attempted to hire him to kill Bill Jenkins; and that was not communicated to the defendant until after the death of the deceased. The Court: Of course, it wouldn't be admissible. Mr. Stephenson: It is admissible under the decisions I have shown you. The Court: We disagree on the law. Mr. Stephenson: We offer it for the purpose of showing the attitude of the deceased and for the purpose of showing who was the probable aggressor at the time the deceased was killed. Mr. Parham: To which we object as incompetent, irrelevant and immaterial. The Court: Sustained. Exception."

Frank Mason testified:

"I have lived in Weleetka all my life; had a conver-

sation with Roy Bradburn in the fall of 1940 with reference to Bill Jenkins. I was coming down the street. He called me and told me he had a job for me that would just fit me, I said, 'All right.' Later he talked to me again and asked me what about that job, I said, 'am ready,' He said Bill Jenkins was in his way and he wanted to get him out of his way and I told him I would study about it. Quite a while after he asked him again; and I told him I wouldn't kill Bill Jenkins or no one else unless he jumped on me or we had a fight and I had to kill him. He told me he would pay whatever I thought it was worth. I told him I didn't want to take a man's life. I told Bill Jenkins what Roy had said. Quite a while after that, I told Bill what Roy had said, we were on our way to Oklahoma City together, I didn't tell him all, just told him he better be careful that Roy was liable to kill him or get him killed. I have been convicted of a felony and served a term in Granite for burglary."

On cross-examination he stated:

"The first conversation was in the fall of 1940; the second conversation I believe this year; it was behind Mr. Reed's beer garden; a man walked up and started talking to him and I walked off. The last time I talked to him was in the spring of this year."

At the close of all the evidence the record shows:

"Mr. Billingsley: I want to make a request and I want to make it in the record. Comes now the defendant and moves the court to instruct the jury to return a verdict of not guilty for the reason that the evidence, all of the evidence, in this case is wholly insufficient to hold the defendant on a charge of murder. The Court: Overruled. Mr. Billingsley: Exception."

Generally speaking, where a homicide occurs under such circumstances that it is doubtful whether the act was committed maliciously or from a well-grounded apprehension of danger, testimony tending to show the general reputation of the deceased as being a violent, quarrel-

some and dangerous man and of threats made by the deceased also acts of violence by the deceased known to the defendant are always admissible in order to determine whether the defendant had reasonable cause to apprehend great personal injury to himself.

In 13 R.C.L. p. 921, sec. 225, it is said:

"While it is doubtful whether in any case mere threats of the deceased can make out a case of self-defense, yet if they were known to the prisoner they should be admitted and weighed by the jury with other acts indicating hostility, to aid in determining whether the fatal act was done under a reasonable and honest conviction that its perpetration, then and there, was necessary on the part of the accused to protect himself. . . .

"While their remoteness in respect of time does not affect their admissibility, their weight as evidence is, however, dependent upon their nearness in point of time, as well as the circumstances attending their utterance."

Sec. 226, Id:

"Uncommunicated threats in some instances, when made near the time of the affray in which the homicide occurred, have been held admissible, as a part of the res gestae. Again, where it is a question whether the accused or the deceased was the aggressor in the fatal encounter, uncommunicated threats are held to be competent. Also, such threats are held to be admissible when corroborative of communicated threats, when they disclose animus, malice, or hostility on the part of the deceased, and 'where they tend to throw light on the occurrence and aid the jury in a correct interpretation of the same.' "

In the case of Mulkey v. State, 5 Okla. Cr. 75, 113 P. 532, this court held:

"In a homicide case, where the defense is justifiable homicide in self-defense, evidence was offered on behalf of the defendant to prove particular instances of violence

and quarrelsome conduct, on the part of the deceased, these acts of violence and misconduct being known to the defendant.

"Held competent for the purpose of showing the disposition of the deceased to become violent without provocation, and as tending to show his condition of mind, and violent temper on such occasions, and his disposition to use deadly weapons."

"The knowledge of the defendant, derived from personal observation, of the deceased's propensity to attack persons without cause, is an important circumstance in determining from the standpoint of the defendant the reasonableness of the danger apprehended by him, and from which the defendant might estimate the conduct of the deceased, the character of the attack made upon him, and what he might expect from his assailant, as well as that which he might at the moment deem necessary to guard himself against." Citing and quoting from Riley v. Com., 94 Ky. 266, 22 S.W. 222; Horbach v. State, 43 Tex. 242; Cawley v. State, 133 Ala. 128, 32 So. 227, also Sneed v. Territory of Oklahoma, 16 Okla. 641, 86 P. 70, 8 Ann. Cas. 354. Also quoting 1 Wigmore on Ev. secs. 63, 198.

In the case of Foster v. State, 8 Okla. Cr. 139, 126 P. 835, this court held:

"Where the issue of self-defense is raised in a murder case, it is competent for the defendant to offer evidence of threats to do him injury, made by the deceased, and hostile demonstrations made toward him by the deceased or others acting with him, whether the defendant was aware of such demonstrations or not."

In the opinion, Furman, P. J., speaking for the court, said:

"Such threats and demonstrations are in no sense of the word hearsay evidence; but they constitute original testimony, and should be received in such case and considered by the jury for what they are worth. In Offitt v.

State, 5 Okla. Cr. 48, 113 P. 554, Judge Armstrong, speaking for the court, said: 'On a trial of a person charged with murder, evidence tending to show that the deceased had made threats against the appellant is competent, and should be admitted when the issue of self-defense is presented.' See, also, White v. State, 4 Okla. Cr. 143, 111 P. 1010, and Saunders v. State, 4 Okla. Cr. 264, 111 P. 965, Ann. Cas. 1912B, 766. For a full discussion of the philosophy of the law of threats, see Morris v. Territory, 1 Okla. Cr. [617], 624, 99 P. 760, 101 P. 111. It would be well for all trial judges in Oklahoma to make themselves familiar with what is there said, because it represents the mature views of this court, and will be followed as a precedent."

In Rogers v. State, 8 Okla. Cr. 226, 127 P. 365, 366, this court held:

"In a case of murder, where the issue of self-defense is presented, the jury should be instructed that, in passing upon the questions as to whether or not the defendant acted upon reasonable apprehension of danger, they must view the facts and circumstances in evidence from the defendant's standpoint and as they then reasonably appeared to him."

For a full discussion of the philosophy of the law of threats, whether communicated or uncommunicated, see opinion.

In Price v. State, 1 Okla. Cr. 358, 98 P. 447, 448, this court said:

"When threats are relied upon as part of the ground for reasonable apprehension of danger, it is proper to admit any evidence which will tend to show the true character of the threats so made, and which tends to add weight to or detract from them."

In the case of Tapedo v. State, 34 Okla. Cr. 165, 245 P. 897, this court held:

"In a homicide case, evidence of the relation of the parties, ill treatment, previous assaults and difficulties, where not too remote, are admissible as tending to establish motive, intent, and state of mind of the parties. Such evidence is not to be excluded although it may tend to prove some other offense. But in such case the court should by proper instruction restrict such evidence to the purpose for which it is admitted."

And see Stogsdill v. State, 24 Okla. Cr. 152, 216 P. 681.

In Starks v. State, 67 Okla. Cr. 156, 93 P. 2d 50, 51, this court held:

"Explanatory circumstances and declarations connected with the commission of a homicide, which have a tendency to shed light on the motives of the parties, are admissible in evidence, including antecedent declarations made by the deceased and the defendant, where they form some link in the chain of circumstances, explanatory of their motives or other vital issues involved."

In Roddie v. State, 19 Okla. Cr. 63, 198 P. 342, this court held:

"Declarations, as a part of the res gestae, are regarded as verbal acts or verbal parts of an act, indicating a present purpose or intention, and therefore are admitted in proof like any other material facts."

Citing 3 Wigmore Ev. sec. 172; 1 Greenl. Ev., sec. 108; 10 R.C.L. 76; Underhill, Cr. Ev., secs. 99 and 100.

In Sunday v. State, 14 Okla. Cr. 620, 174 P. 1095, it was held:

"On a trial for murder, where it appeared that the deceased and the defendant had an altercation during the progress of a card game, and the defendant then went to his home and procured a gun, and returned therewith, and shot the deceased, statements made by the defendant

to his sisters that he was taking the gun with the intention of arresting the deceased, were admissible as part of the res gestae."

In the case of State v. Jennings, 96 Mont. 80, 28 P. 2d 448, 121 A.L.R. 375, the Montana Supreme Court held:

"One relying upon appearances and a reasonable determination upon such appearances as a defense, in a prosecution for homicide ought to be allowed to prove every fact and circumstance known to him and connected with the deceased which was fairly calculated to create an apprehension for his own safety." See R.C.L., title Homicide, sec. 124. Citing: Sneed v. Territory, 16 Okla. 641, 86 P. 70, 8 Ann. Cas. 354. Mathews v. State, 16 Okla. Cr. 466, 184 P. 468; Edwards v. State, 58 Okla. Cr. 15, 48 P. 2d 1087, 1088.

In Edwards v. State, supra, this court held:

"Where, in a homicide case, self-defense is pleaded, and there is evidence tending to support the same, specific acts of violence on the part of the deceased may, if known to the defendant prior to the homicide, be shown in evidence."

"Any legal evidence from which a jury may legally adduce guilt or innocence is admissible if, when taken with other evidence in the case, its relevancy appears, and the rejection of competent and material testimony offered by the defendant constitutes prejudicial error."

In the opinion it is said:

"In every criminal prosecution the burden rests upon the state of proving the corpus delicti beyond a reasonable doubt. In prosecution for homicide the corpus delicti consists of two fundamental and necessary facts: First, the death; second, the criminal agency of another as the cause; as applicable to this case, it was necessary to show, first, that the deceased died from the effects of a wound, and, second, that the wound was unlawfully inflicted by the defendant. . . .

"Mere admissions of inculpatory facts are not necessarily confessions, and when a person only admits certain facts from which the jury may or may not infer guilt, there is no confession. The facts the defendant admitted could have been true and not be inconsistent with his innocence of the crime of murder; he made the admissions, not for the purpose of conceding that he was guilty or with any view to confess his guilt, but in the line of a denial of guilt, not an express, but an implied, denial."

In stating the rule of evidence as to the effect of introduction in evidence of the admissions of the defendant by the state, it is said in 20 Am. Jur. 463, sec. 551, in part as follows:

"If a statement is admissible in evidence as an admission or declaration, it is admissible as an entirety, including parts that are unfavorable, as well as those that are favorable, to the party offering it in evidence. . . .

"It is an elementary rule of law that when admissions of one on trial for the commission of a criminal offense are allowed in evidence against him, all that he said in that connection must also be permitted to go to the jury, either through cross-examination of the witness who testified to the admissions or through witnesses produced by the accused. Moreover, the fact that declarations made by the accused were self-serving does not preclude their introduction in evidence as a part of his whole statement, if they are relevant to statements introduced by the state and were made on the same occasion as the statements introduced by the state. . . .

"Moreover, the truth of exculpatory matter in an admission of one accused of crime, which is introduced in evidence by the state, must be presumed unless its falsity is shown."

In the case of Forrester v. State, 93 Tex. Cr. R. 415, 248 S. W. 40, 41, 26 A.L.R. 537, Annotation supplemental to 2 A.L.R. 1017, p. 541, the First paragraph of the syllabus reads:

"The truth of exculpatory matter in an admission of one accused of crime, which is introduced in evidence by the state, must be presumed unless its falsity is shown."

In the opinion it is said:

"The rule for which appellant contends is stated in Pharr's Case, [Pharr v. State] 7 Tex. App. [472] 478, in the following language: 'When the admissions or confessions of a party are introduced in evidence by the state, then the whole of the admissions or confessions are to be taken together, and the state is bound by them unless they are shown to be untrue by the evidence; such admissions or confessions are to be taken into consideration by the jury as evidence, in connection with all the other facts and circumstances of the case.'

"This rule has been emphasized and reaffirmed in many subsequent cases."

And see Com. v. Britland, 15 N. E. 2d 657, 118 A.L.R. 132; Lowber v. State, 6 Boyce, Del., 353, 100 A. 322, 2 A.L.R. 1014.

In 22 C.J.S., Criminal Law, § 839, p. 1472, it is said:

"It is the general rule both under statutes and at common law that an extrajudicial confession does not warrant a conviction unless it is corroborated by independent evidence of the corpus delicti." Choate v. State, 12 Okla. Cr. 560, 160 P. 34, L.R.A. 1917A, 1287; Thomas v. State, 25 Okla. Cr. 409, 220 P. 976; Boyle v. State, 27 Okla. Cr. 196, 226 P. 389, and cases cited.

In 22 C.J.S., Criminal Law, § 842, p. 1478, it is said:

"Where the state introduces in evidence the confession of accused, it is bound by exculpatory statements contained therein, unless they are shown by the evidence to be untrue; but the falsity of such exculpatory statements may be shown by circumstantial as well as by direct evidence."

In Thomas v. State, 98 Tex. Cr. 428, 266 S. W. 147, it was held:

"Where state relied almost wholly upon defendant's confession to prove corpus delicti, it had burden to disprove his exculpatory declaration therein."

In Mays v. State, 19 Okla. Cr. 102, 197 P. 1064, 1068, it is said:

"This court adheres to the rule that a conviction cannot be had on the extrajudicial confession of the defendant without independent evidence of the corpus delicti. . . .

"The court must decide in the first instance this question. However, the decision of the court does not bind the jury, as the province of the court in such particular is only to determine whether sufficient evidence has been adduced to go to the jury for their determination."

And see also Howington v. State, 35 Okla. Cr. 352, 250 P. 941.

In the case of Collegenia v. State, 9 Okla. Cr. 425, 132 P. 375, 379, it is said:

"A man has the right to defend his domicile against every unlawful invasion and to defend himself and those within it against every and all violence, without the necessity of retreat, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent the commission of a felony thereon or therein. Semayne's Case, 3 Coke, 91; Foster's Crown Cases, 273; Patten v. People, 18 Mich. 314, 100 Am. Dec. 173; State v. Patterson, 45 Vt. 308, 12 Am. Rep. 200; Stoneham v. Commonwealth, 86 Vt. 523, 10 S. E. 238; Wright v. Commonwealth, 85 Ky. 123, 2 S.W. 904; State v. Taylor, 143 Mo. 150, 44 S. W. 785; Thompson v. State, 61 Neb. 210, 85 N.W. 62, 87 Am. St. Rep. 453; Beard v. United States, 158 U. S. 550, 15 S. Ct. 962, 39 L. Ed. 1086; Kirk v. Territory, 10 Okla. 46, 60 P. 797; Mahaffey v. Territory, 11 Okla. 213, 66 P. 342; Price v. State, 1 Okla. Cr. 358, 98 P. 447."

The Code of Criminal Procedure, sec. 32, 22 O. S. 1941, provides:

"Resistance sufficient to prevent the offense may be made by the party about to be injured:

"1.   To prevent an offense against his person or his family, or some member thereof.

"2.   To prevent an illegal attempt, by force, to take or injure property in his lawful possession.   R. L. 1910 § 5557."

In the case of Armstrong v. State, 11 Okla. Cr. 159, 143 P. 870, 872, this court said:

"The right of a man to defend his domicile against every unlawful invasion and to defend himself and those within it against every and all violence without the necessity of retreat, even to the extent of taking life, if it be actually or apparently necessary to do so in order to prevent the commission of a felony thereon or therein, has been clearly defined by the statute.

"It is provided in the Penal Code [21 O. S. 1941 § 733]:

" 'Homicide is also justifiable when committed by any person in either of the following cases:

" 'First.   When resisting any attempt to murder such person, or to commit any felony upon him, or upon or in any dwelling house in which such person is; or,

" 'Second.   When committed in the lawful defense of such person, or of his or her husband, wife, parent, child, master, mistress or servant, when there is a reasonable ground to apprehend a design to commit a felony, or to do some great personal injury, and imminent danger of such design being accomplished; or,

" 'Third.   When necessarily committed in attempting, by lawful ways and means, to apprehend any person for any felony committed; or in lawfully suppressing any riot; or in lawfully keeping and preserving the peace.'

"In Collegenia v. State, 9 Okla. Cr. 425, 132 P. 375, the court, construing the foregoing section, said:

" 'The law in its humanity will not justify the taking of life to repel a mere trespass, or invasion of the home without felonious intent or in resisting a nonfelonious assault'; but a man who is without fault may repel force with force in defense of his person, habitation, or property against any one or many who manifestly intend and endeavor with violence to commit a felony thereon or therein. In such case he is not compelled to retreat, but may pursue his adversary until he finds himself out of danger, and if in the conflict between them he happens to kill him, such killing is justifiable.' . . .

"Another provision of the Penal Code [21 O. S. 1941 § 643] is as follows:

" 'To use or attempt to offer to use force or violence upon or toward the person of another is not unlawful in the following cases:

" 'First. . . .

" 'Second. . . .

" 'Third. When committed either by the party about to be injured, or by any other person in his aid or defense, in preventing or attempting to prevent an offense against his person, or any trespass or other unlawful interference with real or personal property in his lawful possession; provided the force or violence used is not more than sufficient to prevent such offense.' . . .

" 'An attack on a house or its inmates may be resisted by taking life. . . . (3) Aside from these two grounds, which may be also regarded as included in the right of prevention of felonies, the occupant of a house has a right to resist, even to the death, the entrance of persons attempting to force themselves into it against his will, when no action less than killing is sufficient to defend the house from entrance; and even the killing of an officer of the law, known to be such, endeavoring thus to

intrude, is not murder, but manslaughter. A man's house, however humble, is his castle; and his castle he is entitled to protect against invasion. The rule is to be traced to old times when the peace of the body politic, as well as of individuals, depended upon the maintenance of the inviolability of houses as castles. And the rule continues to exist when there is an equal reason for the maintenance of the inviolability of houses as homes.'" Citing and quoting 1 Wharton Crim. Law, 10th Ed., par. 503; also 1 Bishop's New Cr. Law, sec. 858.

Upon the uncontroverted facts and the law applicable thereto, as set forth in the foregoing authorities, these prior assaults and acts of violence being known to the defendant were important circumstances in determining from his standpoint the reasonableness of the imminent danger apprehended by him, and that the killing was necessary, not only to defend himself against loss of life or great personal injury, but also to protect his domicile and those within from unlawful interference. It follows that for the reasons stated, the exclusion of the evidence offered constitutes reversible error, in that it was prejudicial to the substantial rights of the defendant.

One of the grounds of the motion for new trial and assigned as error is: That the court erred in refusing to grant the defendant a reasonable length of time to examine the instructions and to prepare objections and exceptions.

The record shows that immediately upon the close of all the evidence, that the court started to read the instructions, and immediately counsel asked for permission, and just three minutes before the state closed, counsel asked permission of the court to see the instructions before they were read, in order to determine whether or not he desired to offer additional instructions.

Thereupon the court reads the instructions to the jury.

Thereupon the defendant at this time excepts to instructions Nos. 8, 12 and 17.

"The Court: All right."

It is undoubtedly the law that the accused in any criminal action is entitled, as a matter of right, to require in the first instance a compliance with the ordinary rules and forms of law that secure to him a fair and legal trial.

The Code of Criminal Procedure, fifth subdivision of sec. 831, 22 O. S. 1941, provides as follows:

"When the evidence is concluded, the attorneys for the prosecution may submit to the court written instructions. If the questions of law involved in the instructions are to be argued, the court shall direct the jury to withdraw during the argument, and after the argument, must settle the instructions, and may give or refuse any instructions asked, or may modify the same as he deems the law to be. Instructions refused shall be marked in writing by the judge, if modified, modification shall be shown in the instruction. When the instructions are thus settled, the jury, if sent out, shall be recalled and the court shall thereupon read the instructions to the jury." (R. L. 1910, § 5870.)

In Inman v. State, 22 Okla. Cr. 161, 210 P. 742, 747, it is said:

"The foregoing statutory provision clearly contemplates that the instructions should be settled before being read to the jury. Boutcher v. State, 4 Okla. Cr. 585, 112 P. 762.

"Requested instructions must be in writing and presented to the trial court before the general charge is settled

and read, otherwise the request comes too late. Williams v. State, 12 Okla. Cr. 39, 151 P. 900.

"In the case of Russell v. State, 17 Okla. Cr. 164, 194 P. 242, it is held:

" 'The trial court is required to settle, and counsel are required to take exceptions to, instructions before the same are read to the jury.

" 'When requested, it is error for the trial court to refuse to permit counsel for the defendant to have a reasonable opportunity to be heard upon the instructions to be given to the jury before the same are read to the jury.'

"It is as much the duty of counsel to present requested instructions and to take exceptions to instructions before the same are read to the jury as it is the duty of the trial court to give counsel an opportunity to be heard upon the instructions. The provision of the statute in each respect is salutary, affording to defendant and the trial court that protection which prevents an unfair advantage to be taken of either."

In Collegenia v. State, supra [9 Okla. Cr. 425, 132 P. 376], this court held:

"In a prosecution for murder, the court should instruct upon the law applicable to the case, whether requested to do so or not. The law applicable is determined by the accusation and the evidence introduced upon the trial, and, when the evidence tends to show justification in self-defense and in defense of habitation, it is the duty of the court to submit instructions properly embracing the law of self-defense."

The defendant is entitled to instructions defining the law applicable to his theory and covering his defense, if there is any competent evidence tending to substantiate that theory.

The Code of Criminal Procedure provides, 22 O. S. 1941 § 856:

"In charging the jury, the court must state to them all matters of law which it thinks necessary for their information in giving their verdict."

The record shows that the sole ground upon which the case was submitted to the jury was the issue as to whether the defendant believed at the time he shot the deceased that he was in imminent danger of death or great bodily harm at the hands of the deceased.

In Woodruff v. State, 74 Okla. Cr. 289, 125 P. 2d 211, 218, it was held by this court:

"The policy of the law is that all persons shall have a fair and impartial trial. It cannot be said that a fair and impartial trial has been had unless the jury have been properly instructed as to the law of the case; and where the instructions do not fully present all the material issues raised, the judgment of conviction will be set aside. Miles v. State, 41 Okla. Cr. 283, 273 P. 284."

It also appears that the charge of the court did not contain any instruction upon the undisputed facts that the defendant was acting not only in his real or apparent necessary defense of his person, but was also acting in defense of his habitation and his family against the deceased who manifestly intended with violence to commit a felony thereon or therein. If the case was one to be submitted to the jury, those were questions of fact for the jury under proper instructions as to the law applicable thereto.

In the case of Liberty Nat. Bank v. Semkoff, 184 Okla. 18, 84 P. 2d 438, 439, the Supreme Court of Oklahoma held:

"Trial court has duty on its own motion to properly

instruct jury on decisive issues made by pleadings and evidence introduced at the trial, and failure so to do constitutes 'fundamental error.' "

Upon the undisputed facts and for the reasons hereinbefore stated, we think that the question of the defendant's guilt of the crime of murder should not have been submitted to the jury. The issue upon the evidence at most was manslaughter or justifiable homicide in self-defense, and in defense of his habitation and in defense of his family, and these are principles of law which, upon the defendant's theory of the case, should have been given in the court's charge to the jury.

In this connection the trial court allowed an exception to the giving of instruction No. 8, in part as follows:

"The jury is instructed that the defendant in this case is presumed to be innocent of the crime charged in the information and this is a presumption of law that remains with him and is thrown around him for his protection up to the moment when the killing is proved beyond a reasonable doubt or admitted by the defendant.

"When the killing is proved beyond a reasonable doubt, or admitted by the defendant, and the plea of self-defense is interposed, as in this case, it then devolves upon the defendant to show any circumstances to excuse or justify it by some proof strong enough to create in your minds a reasonable doubt as to whether the defendant acted in his real or apparent necessary self-defense, unless the proof on the part of the state shows that the defendant was justified in committing the act."

In Edwards v. State, supra [58 Okla. Cr. 15, 48 P. 2d 1088], this court held, Syl. 3:

"In a prosecution for homicide the corpus delicti consists, first, in the proof that the deceased died from the effects of a wound, and, second, that the wound was unlawfully inflicted."

In the opinion it is said:

Our Code provides that a plea of not guilty puts in issue every material allegation in the information. [22 O. S. 1941 § 518.].

"It also próvides that a defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt as to whether his guilt is satisfactorily shown, he is entitled to be acquitted. [22 O. S. 1941 § 836.] It further provides: 'Upon a trial for murder, the commission of the homicide by the defendant being proven, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon him, unless the proof on the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable.' [22 O. S. 1941 § 745.]

"Under this provision, if the prosecution proves the death of the deceased and the fact that he was killed by the defendant, without proving circumstances of mitigation or tending to show justification or tending to show that the crime committed only amounted to manslaughter, then the burden is upon the defendant if he contends that he was justifiable, of producing evidence showing that fact. The quantum of evidence necessary for that purpose is fixed by law and is such as is sufficient to raise reasonable doubt upon the issue. . . .

"It follows that the burden was not on the defendant to show affirmatively that he was free from fault in bringing on the difficulty, and when the ingredients of self-defense have been established, the burden is on the state to show that the defendant was not free from fault, unless it has been shown that the killing was unnecessary for self-defense."

The most important question in this case is presented by the ninth assignment of error, to the effect, that the court erred in compelling the defendant to go to trial, in that he had not been furnished with a list of the wit-

nesses to be called in chief to prove the allegations of the information together with their post office addresses, as guaranteed by the Bill of Rights. Const. art. 2, sec. 20, providing:

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury of the county in which the crime shall have been committed: . . . He shall be informed of the nature and cause of the accusation against him and have a copy thereof, and be confronted with the witnesses against him, and have compulsory process for obtaining witnesses in his behalf. He shall have the right to be heard by himself and counsel; and in capital cases, at least two days before the case is called for trial, he shall be furnished with a list of the witnesses that will be called in chief, to prove the allegations of the indictment or information, together with their postoffice addresses."

And as provided by art. 2, sec. 7, Id., declaring that:

"No person shall be deprived of life, liberty, or property, without due process of law."

The question presented is raised for the first time in this court by counsel for the defendant, who it appears had no part in the trial.

It is so well settled as to be elementary that questions involving jurisdiction of the trial court may be raised at any stage of the proceedings, and may be questioned for the first time in this court.

Counsel in his brief states:

"It will be observed that the state introduced in chief the testimony of nine witnesses, all of whose names without postoffice addresses were endorsed on the information. It will also be observed that no copy of the list of the state's witnesses in chief was ever served upon the defendant, or waived by him; and that during the entire

time since the homicide, including the period of trial the defendant had been confined in prison, and had no free opportunity to avail himself of that personal inquiry and investigation secured to him under the requirements of the Bill of Rights.  art. II sec. 20 of the Oklahoma Constitution, and under like statutory provisions; and it is nowhere shown by the record that the defendant either voluntarily, actually, constructibly, intentionally, or otherwise waived his constitutional right to be furnished with this list two days before the trial."

In the state's brief it is said:

"Defendant recognizes the fact that the court has many times held that where the defendant announces ready for trial without raising this question, the same may not be subsequently presented as error.  But he contends that in this instance, the defendant announced not ready and that he did not waive his right to raise this contention."

Counsel answering says that:

"However, it will be observed that the defendant in this case at no time announced ready for trial.  On the contrary, he announced not ready for trial."

In the case of Starr v. State, 5 Okla. Cr. 440, 115 P. 356, 367, a capital case, we said:

"Generally speaking, the constitutional provisions guaranteeing to every accused person in a criminal action certain rights may be separated into two classes:  First, those in which the public generally, and as a community, is interested, as well as the accused, and which are jurisdictional as affecting the power of the court to try the cause, second, those more in the nature of privileges which are for the benefit of the accused alone, and do not affect the general public.   The former cannot be waived.   Jurisdiction to try the cause is conferred by the law.   Consent cannot confer jurisdiction, but the accused may waive a constitutional right or privilege designed

for his protection, where no question of public policy is involved. The public as well as the accused have an interest in every criminal trial. The life and liberty of the citizen is a matter of supreme importance to the state, and it should not allow him to throw either away by a failure, intentional or otherwise, to take advantage of his constitutional safeguards."

In Spess v. State, 13 Okla. Cr. 277, 164 P. 131, Judge Brett, speaking for the court, said:

"Regardless of our feeling in the matter, or any resentment we might have against the atrocious crime charged against the plaintiff in error, the violation of a plain, simple, and unambiguous demand of the Constitution must not be tolerated by the courts; and responsibility in such cases must rest upon the tribunal in which it is practiced or attempted. . . . Under the last provision of this section of theConstitution the accused in capital cases does not have to demand a list of the witnesses together with their post office addresses, but the Constitution makes that demand for him. And, unless he waives it, he cannot be legally put upon trial until that demand has been complied with. Ordinarily, in applications for continuance, the court may exercise a sound judicial discretion; but it would be absurd to say that this discretion could go to the extent of nullifying a plain, simple, unambiguous demand of the fundamental law of the state, made exclusively for the benefit of the accused. The court in the case at bar had no more authority to force the plaintiff in error to trial until he had waived this demand of the Constitution, or it had been complied with, than he would have had to force him to trial without an information or a jury. For both of these rights rest upon the same authority and are guaranteed to the accused in the same section of the Constitution; and no one can nullify them, and the accused alone can waive them."

In the case of Goben v. State, 20 Okla. Cr. 220, 201 P. 812, 814, a capital conviction, and the death penalty assessed, it is said:

"The record does not show that this defendant was at any time furnished with a list of witnesses to be called in chief to prove the allegations of the information, together with their post office addresses, or that he was served with a copy of the information, nor does the record show that the defendant waived these constitutional rights. . . .

"In cases of this kind, where the defendant is to be placed on trial for his life, he should have the advantage of every right which the law secures to him upon his trial. A fair and impartial administration of the laws is one of the most sacred rights of the citizen, and it is the duty of trial courts in the administration of the law to see that the accused, however guilty he may be, shall have a fair trial according to the due and orderly course of the law, and this duty is emphasized in a capital case."

In Polk v. State, 26 Okla. Cr. 283, 224 P. 194, a homicide case, this court "held, that under this provision of the Constitution the defendant in a capital case does not have to demand a list of the witnesses to be called in chief, because the Constitution makes the demand for him, and the trial court is without authority to force him to trial until this provision has been complied with, unless the defendant has waived this right."

In Sutton v. State, 35 Okla. Cr. 263, 250 P. 930, 933, a homicide case, we said:

"Every person charged with crime, whether guilty or innocent, is entitled to a fair and impartial trial—that is, a trial in accordance with the rules of law and the principles of justice; and it is a duty resting upon the courts to see that this guaranty conferred by the Constitution upon every citizen is upheld and sustained. . . .

"Construing the second provision of section 20 of the Bill of Rights, above quoted, the uniform holding of this court is that, in a capital case, the defendant does not

have to demand a list of the witnesses, together with their post office addresses; that the Constitution makes that demand for him, and, unless he waives it, he cannot be legally put upon trial until that demand has been complied with. Spess v. State, 13 Okla. Cr. 277, 164 P. 131; Goben v. State [20 Okla. Cr. 220], 201 P. 812; Polk v. State [26 Okla. Cr. 283], 224 P. 194. . . .

"It is true that many constitutional guaranties may be waived by an accused person who comes into court represented by counsel and being fully advised of all his rights, and in such cases it might be said that he waives a right for which he does not ask. However, the record in this case shows that appellant did not waive any constitutional or statutory right, except in so far as his plea of guilty waived his right to be tried by a jury. In our opinion the constitutional right to be represented by counsel and the right in capital cases, at least two days before the case is called for trial, to be furnished with a list of the witnesses, together with their post office addresses, are essential to due process of law guaranteed to the citizen by section 7, Bill of Rights. We are inclined to think that a conviction had by a denial of these constitutional rights simply amounts to judicial lynch law. * * *

"While promptness in the apprehension and trial of persons accused of crime is commendable, the law has provided how trials should be had, and the enforcement of law is to be arrived at only by adhering to legal requirements and principles of justice and fair trials as provided by constitutional provisions, legislative enactment, and well-established rules of law.

"It has been well said that the law is not designed to be a swift engine of oppression and vengeance, but it was and is designed to try and convict men only after due hearing and a fair trial."

In McKee v. State, 38 Okla. Cr. 132, 259 P. 607, 609, Judge Edwards, speaking for the court, said:

"This court in construing this clause of the Constitution held that a defendant confined in jail does not have to demand a list of the witnesses; the Constitution makes the demand for him, and the trial court is without authority to force him to trial until this provision has been complied with."

In the case of Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 1023, 82 L. Ed. 1461, 146 A.L.R. 357, the Supreme Court of the United States held:

"Courts indulge every reasonable presumption against a waiver of fundamental constitutional rights, and do not presume acquiescence in their loss.

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege."

Mr. Justice Black, delivering the opinion of the court, in part said:

"The purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights, and the guaranty would be nullified by a determination that an accused's ignorant failure to claim his rights removes the protection of the Constitution. . . .

"There being no doubt of the authority of the Congress to thus liberalize the common-law procedure on habeas corpus in order to safeguard the liberty of all persons within the jurisdiction of the United States against infringement through any violation of the Constitution or a law or treaty established thereunder, it results that under the sections cited a prisoner in custody pursuant to the final judgment of a state court of criminal jurisdiction may have a judicial inquiry in a court of the United States into the very truth and substance of the causes of his detention, although it may become necessary to look behind and beyond the record of his con-

viction to a sufficient extent to test the jurisdiction of the state court to proceed to judgment against him. . . .

"Of the contention that the law provides no effective remedy for such a deprivation of rights affecting life and liberty it may well be said—as in Mooney v. Holohan, 294 U. S. 103, 113, 55 S. Ct. 340, 342, 79 L. Ed. 791 [794], 98 A.L.R. 406—that it 'falls with the premise.' To deprive a citizen of his only effective remedy would not only be contrary to the 'rudimentary demands of justice" but destructive of a constitutional guaranty specifically designed to prevent injustice. . . .

"A court's jurisdiction at the beginning of trial may be lost 'in the course of the proceedings' due to failure to complete the court—as the Sixth Amendment requires—by providing counsel for an accused who is unable to obtain counsel, who has not intelligently waived this constitutional guaranty, and whose life or liberty is at stake. If this requirement of the Sixth Amendment is not complied with, the court no longer has jurisdiction to proceed. The judgment of conviction pronounced by a court without jurisdiction is void, and one imprisoned thereunder may obtain release by habeas corpus."

In Ex parte Barnett, 67 Okla. Cr. 300, 94 P. 2d 18, 19, this court held:

"Courts indulge every reasonable presumption against a waiver of fundamental constitutional rights, and do not presume acquiescence in their loss."

Further held:

"Where accused did not have assistance of counsel and did not effectively waive constitutional right to assistance of counsel for his defense, conviction was void as having been rendered without jurisdiction. Okla. St. Ann. Const. Bill of Rights, § 20." Citing Johnson v. Zerbst, supra.

Quoting Howington v. State, 30 Okla. Cr. 243, 235 P. 931, 933, wherein it is said:

"Where it appears on appeal that a defendant has been denied a right guaranteed by the Constitution, such showing requires a reversal, unless the record clearly shows that the right was waived, or that no injury could have resulted to the accused by reason of such denial.

"'A denial of a constitutional right to a person prosecuted for a crime is prima facie prejudicial. . . .

"The record does not show that this defendant was at any time furnished with a list of the witnesses to be called in chief to prove the allegations of the information together with their post office addresses, or that he was served with a copy of the information, nor does the record show that the defendant waived these constitutional rights.

"It is well settled that under this provision of the Constitution the defendant in a capital case does not have to demand a list of the witnesses to be called in chief, because the Constitution makes the demand for him, and the trial court is without authority to force him to trial until this provision has been complied with, unless the defendant has waived this right. . . .

"The trial judge has like official responsibility to that of the judges of the appellate court, and every reasonable presumption must be indulged that he properly guarded the rights of the defendant. A consideration of the facts here presented, however, impels the conclusion that the trial court erred in its view of the law. . . .

"'The law travels with a leaden heel, but strikes with an iron hand,' is a maxim pregnant with obvious meaning. In this instance, it doffed the 'leaden heel,' yet struck with the iron hand."

In Ex parte Meadows, 70 Okla. Cr. 304, 106 P. 2d 139, 147, it is said:

"The presumption, where the record is silent, is that the offer to appoint counsel was not made. As was stated by the United States Supreme Court in the first para-

graph of the syllabus of Johnson v. Zerbst, 304 U. S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461:

" 'Courts indulge every reasonable presumption against a waiver of fundamental constitutional rights, and do not presume acquiescence in their loss.' "

The state only demands the punishment of a citizen when his guilt has been clearly established according to the forms and rules of law, prescribed for ascertaining his guilt. It is not to shield the guilty, but to protect the innocent, that the courts are steadfast in upholding the forms and rules of law by which it may be lawfully determined who are guilty.

Section 19, art. 2, of the State Constitution provides:

"The right of trial by jury shall be and remain inviolate . . ."

This provision of the Bill of Rights unquestionably preserves the right and necessity of trial by jury as it existed at the time of the adoption of the Constitution, except as modified by the Constitution itself. Ex parte Wilkins, 7 Okla. Cr. 431, 422 P. 1118.

Our Constitution further provides, sec. 20, art. 7:

"In all issues of fact joined in any court, all parties may waive the right to have the same determined by jury; in which case the finding of the judge, upon the facts, shall have the force and effect of a verdict by jury."

In Cowden v. State, 5 Okla. Cr. 71, 113 P. 202, it is said:

"The Supreme Court of this state in the case of Farmers' Bank v. McCall, reported in 25 Okla. 600, 106 P. 866, 26 L.R.A., N.S., 217, discusses this latter provision of the Constitution, and says that the highest evidence of waiver is by consent entered of record."

Contruing this provision in Morrison v. State, 31 Okla. Cr. 11, 236 P. 901, it is said:

"The right is not given to a defendant to elect whether he will be tried by the court or by a jury. The state is entitled to a jury, although the defendant may expressly waive a jury. The Constitution (section 20, art. 7) contemplates that in order for a waiver to be effective both parties should waive the right to have the issues of fact determined by a jury."

Thus it appears that two things must concur, the waiver by the accused and the consent of the state. See Ex parte King, 42 Okla. Cr. 46, 274 P. 682; Booth v. State, 67 Okla. Cr. 413, 94 P. 2d 846.

Those laws by which the exercise of power is restrained and regulated are fundamental. The Constitution of the United States is the fundamental law of the land.

Fundamental error, which can be considered on appeal without objection or exception, is error which goes to the foundation of the case, or which takes from the accused a right essential to his defense, where it appears, and justice requires, this court will consider it whether or not exceptions were taken in the court below.

In addition to the foregoing it is clearly disclosed by the record that the court erred in overruling defendant's motion for a continuance applied for on the ground of the absence of one Vess Fuquay, a resident of Oklahoma county. The allegations of the motion as to the absent witness are as follows:

That said Vess Fuquay, if present, would testify in part as follows:

That on the day Roy Bradburn was killed he told

said witness that he was going to kill Bill Jenkins, the defendant.

That he knows that Roy Bradburn carried a short barrel .38 caliber pistol, and had said pistol in his right hand front pocket when he talked with him approximately 20 minues before he was killed.

That if present he would further testify that Roy Bradburn pulled a gun upon a group at the home of Nancy Seavers Bradburn approximately 60 days before his death and threatened to kill persons present, including the defendant, and that he, said witness, persuaded Bradburn to quiet down.

That said Vess Fuquay resides in Oklahoma City, Oklahoma County, the place to which said subpoena was issued. That this defendant has used every means in his power to obtain the testimony of said absent witness.

The application was subscribed and sworn to by the defendant.

Ordinarily applications for continuance are addressed to the discretion of the trial court. However, in the case at bar, the record shows that the constitutional right of the defendant to "have compulsory process for obtaining witnesses in his behalf" was denied. Const. art. 2, sec. 20.

In order that the accused may have the full benefit of this constitutional right, the Code, chapter 9, tit. 22, sec. 715, O. S. 1941, provides:

"No person is obliged to attend as a witness, before a court or magistrate out of the county where the witness resides or is served with the subpoena, unless the judge of the court in which the offense is triable, upon an affidavit of the county attorney, or of the defendant or his counsel, stating that he believes that the evidence

of the witness is material and his attendance at the examination or trial necessary, shall indorse on the subpoena an order for the attendance of the witness."

Under this section a witness not residing in the county could not be compelled to attend unless served with a subpoena, upon which the trial judge has indorsed an order for the attendance of the witness.

The sixth article of the Constitution of the United States declares:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The Fourteenth Amendment thereto, among other rights, declares:

"Nor shall any State deprive any person of life, liberty, or property, without due process of law."

The language of said article 6 and the aforesaid clause of the Fourteenth Amendment is direct and certain, and the adjudication of the United States Supreme Court on the questions presented by the record are conclusive on the state courts.

And section 1 of article 1 of the Oklahoma Constitution declares that:

"The Constitution of the United States is the supreme law of the land." Ex parte Nowabbi, 60 Okla. Cr. 111, 61 P. 2d 1139. And see Ex parte Walrod, 73 Okla. Cr. 299, 120 P. 2d 783.

In the case of Mooney v. Holohan, 294 U. S. 103, 55 S. Ct. 340, 79 L. Ed. 791, 98 A.L.R. 406, the United States Supreme Court held:

"The constitutional requirement of due process in safeguarding the liberty of the citizen against deprivation through the action of the state embodies the fundamental conceptions of justice which lie at the base of the civil and political institutions of the United States.

"State courts, equally with Federal courts, are under an obligation to guard and enforce every right secured by the Federal Constitution."

This court has held in numerous decisions that the constitutional guaranties of personal liberty as set forth in the Bill of Rights, and all provisions of the Constitution designed to safeguard the liberty and security of the citizen, should be liberally construed by the courts.

The Code of Criminal Procedure is intended to be a comprehensive system embracing every element of procedure necessary for the apprehension and punishment of those guilty of crime, and also to protect the accused in every right guaranteed by the Constitution, or embraced in "due process of law."

The principle that "no person shall be deprived of life, liberty, or property, without due process of law," is older than written constitutions. The phrase, "due process of law," as used in the Bill of Rights, sec. 7, is synonymous with the phrase, "law of the land," as found in Magna Carta.

"Due process of law" as used in the Bill of Rights, sec. 7, is intended to protect the citizen against arbitrary action, and to secure to all persons equal and impartial justice.

The Constitution of our state designed as a bulwark against the power of oppression is broad enough to accomplish its purpose.

In Roddie v. State, 19 Okla. Cr. 63, 198 P. 342, 347, this court said:

"The defendant in any criminal case is entitled as a matter of right to require in the first instance a compliance with the provisions of law safeguarding his right to a fair and impartial trial; and, if the provisions of law intended for his security are willfully disregarded, he may require the state to show that he has not been prejudiced by reason of such noncompliance."

The three essential elements necessary to render a judgment of conviction valid are: The court must have jurisdiction over the subject-matter, the person of the defendant and authority to render the judgment and sentence. If either of these elements is lacking, the judgment is fatally defective.

Jurisdiction of the person and of the subject-matter is not alone conclusive, but jurisdiction of the court or judge thereof to render the particular judgment and sentence is as essential as jurisdiction of the person and subject-matter. If the first does not exist, the judgment and sentence is void. Ex parte Gudenoge, 2 Okla. Cr. 110, 100 P. 39; Ex parte Justus, 3 Okla. Cr. 111, 104 P. 933, 25 L.R.A., N.S., 483; Ex parte Harris, 8 Okla. Cr. 397, 128 P. 156; Ex parte Grant, 32 Okla. Cr. 217, 240 P. 759.

In the state's brief it is said:

"It may be that the defendant's testimony that at the time of the shooting, the deceased took a couple of steps backward and made a motion with his hand to his right side with the statement, 'You come down for trouble and you can get it,' would constitute such a predicate and that the trial court should have admitted the excluded evidence or a large part of it. Conceding this to be true, it does not follow that the error was a material or reversible one."

Upon the uncontroverted facts and circumstances in evidence it appears that the felonious assaults made upon the defendant by the deceased with a deadly weapon, together with repeated threats that he would kill the defendant if he should ever return to his home and his family, up to and until his final attempt at the defendant's home to carry out his threats to kill the defendant, all within the space of twelve hours, were admissible as a part of the res gestae, in that they were so connected with it as to constitute a part of the transaction which ended in the death of Roy Bradburn.

Included in "res gestae" are facts and circumstances so illustrating and characterizing the principal fact as to constitute one whole transaction and illustrating its character. Sunday v. State, supra. Vol. 37 Words and Phrases, Perm. Ed., "Res Gestae."

The state's brief concludes:

"In view of the knowledge of the writer of this brief of the background of this case, we may feel that the defendant did that which should have been done several years ago through a jury verdict and sentence of the court, but such fact does not excuse the defendant."

The undisputed facts in evidence are that at all times that day the deceased was the aggressor. Thus it clearly appears there is no merit in the theory of the state that the homicide was the result of mutual combat.

In Hebert v. State of Louisiana, 272 U. S. 312, 47 S. Ct. 103, 104, 71 L. Ed. 270, 48 A.L.R. 1102, Ann. p. 1106, Mr. Justice Van Devanter, delivering the opinion of the court, says:

"The due process of law clause in the Fourteenth Amendment does not take up the statutes of the several states and make them the test of what it requires. . . .

"What it does require is that state action, whether through one agency or another, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions and not infrequently are designated as 'law of the land.' Those principles are applicable alike in all the states, and do not depend upon or vary with local legislation."

As often stated:

"The constitutional and statutory rights, and legal presumptions and safeguards thrown around the accused with a view of protecting the innocent are as much a part of the law as the statute which denounces crime and prescribes its punishment."

A violation of those fundamental principles of liberty and justice, secured by the law of the land, should find no sanction in the judgments of the courts. For every act of injustice and oppression done under the guise of the law is a blow at the very foundation of the temple of justice.

This court can not give its sanction to the conviction of any person accused of crime where the proceedings upon which the judgment is based show a denial of any fundamental constitutional right to which the accused was entitled under the law of the land, and a conviction of crime should be affirmed only if procedural safeguards of due process of law have been obeyed. Such judicial sanction in any case would impair, if not destroy, the efficacy of the constitutional safeguards designed to protect the rights of all persons accused of crime.

From the foregoing review of the proceedings and the record proper, and the authorities cited, it appears that the evidence adduced by the state fails to incriminate the defendant as a matter of law, and is insufficient to support a conviction of the charge of murder or

manslaughter as charged in the information, and for this reason the court erred in overruling the defendant's demurrer to the evidence when the state rested its case. And on the ground that the evidence was insufficient to prove the corpus delicti, the court erred in overruling the defendant's motion for a peremptory instruction to return a verdict of acquittal at the close of all the evidence in the case. It follows that the trial court was without jurisdiction to render the judgment appealed from.

It appears from the record that the defendant immediately left the scene of the tragedy and went to Weleetka and surrendered to a deputy sheriff, who took him to Okemah within the space of an hour and was confined in the county jail, including the time of the trial and subsequent proceedings, until transferred to the State Penitentiary.

The record shows the information was filed in the district court September 9, 1941, that defendant was arraigned September 10th and given until September 11th to plead, and that on that date entered his plea of not guilty. The record does not show that the defendant was at any time furnished with a list of the witnesses to be called in chief to prove the allegations of the information, together with their postoffice addresses, nor does the record show that the defendant waived this constitutional right.

It follows that for this reason the proceedings had upon the trial were illegal and void for want of jurisdiction.

Finally, after a full and careful consideration of the entire record it is my opinion that for the reasons herein set forth the defendant was denied the protection

afforded by certain constitutional rights amounting to a denial of due process of law, and in my judgment it would be a travesty upon the due and proper administration of justice should the judgment of conviction in this case be permitted to stand.